Anna Bushman et al. v. Estelle Peper Bushman Barlow et al., Appellants.—292 S. W. 1039.

Division Two, March 14, 1927.

**1. WILL CONTEST: Demurrer to Evidence: Inferences to be Drawn.** Where proponent does not stand on his demurrer to the evidence offered at the close of contestant's case, but puts in his own evidence, a final demurrer offered at the close of the case permits a search of all the testimony for the purpose of determining if the contestant's case is aided by proponent's evidence, and it becomes the duty of the appellate court to give the contestant the benefit of every inference which a fair-minded jury, of average intelligence, might reasonably draw from all the evidence, with the necessary limitation that the contestant's evidence to which credence is required to be given must be of a nature affording substantial proof of the invalidity of the will for some one of the grounds alleged.

**2. ——: Undue Influence: Necessary Elements.** To sustain a verdict for contestant based on undue influence alone, the evidence must show that proponent, by persuasion, suggestion, importunity or other device or machination, controlled, directed, restrained or coerced the will or confused the mind of testatrix, or overcame her power of judgment as to the true relation between herself and those who were the natural objects of her bounty in the execution of her will.

**3. ——: ——: Mental Incapacity: Withdrawal: Further Consideration.** The withdrawal by the trial court from the consideration of the jury of the question of testatrix's mental incapacity, being required by the character of the testimony, is conclusive, and renders inapplicable contestant's further contention that it required less influence to control her mind in the making of her will than the mind of one in full mental vigor.

**4. ——: ——: Filial Aid and Attention.** The influence denounced by the law as undue does not consist of the loving and faithful performance by

an unmarried daughter of filial services to an aged mother in the conduct of household duties, even though they may extend beyond legal duty, nor of the affection of the mother for the daughter which comes unsought in response to such kindness. To set aside the mother's will on the ground that it was the result of the undue influence of the daughter, there must be substantial evidence that the influence of the daughter over the mind of the testatrix was of such a nature as to cause the mother to shape her will to conform to the wishes of the daughter, and in effect destroyed the mother's free agency.

5. ———: ———: **Absence of Fraud and Deceit: Partiality.** Consulting her unmarried daughter in the management of her property and giving into her hands the control of household duties by an aged mother, and the affection and good will which naturally arise between them from such kindly relations, do not constitute undue influence and will not avoid the mother's will, if the influence is exercised in a fair and reasonable manner without fraud and deception, even though the will manifests a partiality of the mother for the daughter over her other children, and singles her out as peculiarly worthy of her confidence and trust.

6. ———: ———: **Inference to be Drawn from Circumstances: Opportunity.** There being no direct evidence that the proponent at any time exercised or attempted to exercise influence of any kind upon the testatrix's mind in the making of her will, and an analysis of the testimony failing to disclose any fact or circumstance upon which can fairly be based the inference that the proponent attempted in any manner to influence the testatrix in the making of her will, the verdict of the jury setting the will aside cannot be permitted to rest upon mere opportunity, however ample, for the exercise of such influence. Undue influence need not be shown by direct proof, but may be inferred from facts and circumstances, but such facts and circumstances, aside from opportunity, must from their nature savor of some act which by reasonable construction can be held to indicate a purpose to have the will so drawn that the legatee charged with exercising the undue influence will obtain some advantage or pecuniary benefit from it.

7. ———: ———: ———: **Equal Division: Parts in Trust: Preservation.** A will which divides testatrix's property into three equal parts and gives one portion to her daughter, another to her adult son, and the third to her minor grandson (the child of a deceased son), and makes no distinction between them except (a) that the portion given to the daughter is given to her absolutely; (b) the portion given to the grandson is to be held by the daughter in trust until he reaches twenty-five years of age and if he dies without children before reaching that age his portion is to be applied by the daughter to charitable uses, and (c) the portion given to the son (and to his child upon his death) is given to the daughter in trust to be held by her for thirty years, and if the son dies within the thirty-year period and his child has previously died, said portion is to be applied to charities chosen by the daughter, affords no basis for a finding that the division of the estate constitutes an exercise of undue influence on the part of the daughter. And especially so where (a) the trusteeship imposed a heavy burden on the daughter and the testatrix was familiar with the daughter's fidelity to duty and her knowledge of business which would enable her to intelligently discharge the duties of the trust, and (b) the son was a spendthrift and (c) the grandson a minor. Such a will does not make an unequal division, or provide for an unfair distribution; but its provisions for enjoyment are those of preservation.

8. ———: ———: ———: **Proponent Named as Executrix and Trustee.** The fact that the will named testatrix's daughter as executrix, and as trustee of the equal portions given to her spendthrift son and her minor grandson, will not support an inference of undue influence on the part of the daughter.

9. **WILL CONTEST: Undue Influence: Inference to be Drawn from Circumstances: Prior Gifts to Daughter.** The gift by the testatrix of certain personal property and the conveyance of certain real estate to her daughter years before the making of her will are not facts from which an inference of undue influence on the part of the daughter can be drawn.

10. ———: ———: **Shifting of Burden.** The fact that a daughter possessed and exercised an influence over testatrix in the management of her property is not alone sufficient to shift the burden of explanation upon the daughter, but it must be shown by contestants that the daughter procured the provisions of the will by the exercise of such an influence as thereby to obtain an unfair advantage for herself.

11. ———: ———: **Confidential Relation: Burden of Proof.** The question whether the intimacy between testatrix and her daughter and their reliance upon and confidence in each other, extending over a period of ten years before the will was made, constituted a fiduciary relation and shifted upon the daughter the burden of showing that the will was not the result of her undue influence, is not material, where said proponent at the trial assumed the burden of rebutting any presumption of undue influence, and affirmatively showed, by unreservedly detailing every phase of her relations with testatrix, that she did not exert or attempt to exert any influence whatever upon testatrix in the making of her will.

12. ———: ———: **Former Will: Evidence.** That no improper influence was exercised or employed in the making of a former will is a conclusion authorized by the consent of the contestant to its introduction in evidence by proponents for the purpose of showing an absence of undue influence in the making of the will in contest; and where the former will was identical in all its provisions except in two minor particulars, its introduction in evidence without objection tends to show that the later will in contest was not the result of undue influence.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2708, p. 764, n. 80. **Trial,** 38 Cyc., p. 1550, n. 47. **Wills,** 40 Cyc., p. 1023, n. 29; p. 1079, n. 88; p. 1144, n. 53; p. 1148, n. 72; p. 1151, n. 94, 7; p. 1153, n. 19; p. 1155, n. 31; p. 1165, n. 87; p. 1166, n. 88; p. 1169, n. 21.

Appeal from Circuit Court of City of St. Louis.—*Hon. J. Hugo Grimm,* Judge.

REVERSED *(with directions).*

*Harry H. Haeussler* and *Charles J. McCauley* for appellants; *Foristel, Mudd, Blair & Habenicht* of counsel.

(1)  Proponents having shown that the will in question was executed with all the formalities prescribed by law while the testatrix was of sound mind, the presumption is that it was her free and voluntary act. And the burden of proving that it was the result of undue influence rested with contestant. Turner v. Butler, 253 Mo. 217; Cash v. Lust, 142 Mo. 217; Hughes v. Rader, 183 Mo. 708; Gibony v. Foster, 230 Mo. 136; Carl v. Gobel, 120 Mo. 283; Berberet v. Berberet, 131 Mo. 410; McFadin v. Catron, 120 Mo. 252; Schierbaum v. Schemme, 157 Mo. 1; Maddox v. Maddox, 114 Mo. 35; Sanford v. Holland, 276 Mo. 457; Lorts v. Wash, 175 Mo. 505.  (2)  Contestant

having offered no evidence to discharge the burden of proving that
the will was the result of undue influence which was cast on him,
the trial court should have given proponents' mandatory instruction
in the nature of a demurrer to the evidence, and instructed the jury
to return a verdict upholding the will. Woods v. Carpenter, 166 Mo.
478; Defoe v. Defoe, 144 Mo. 458; Norton v. Paxton, 110 Mo. 456;
Winn v. Grier, 217 Mo. 420; Berberet v. Berberet, 131 Mo. 399.;
Schierbaum v. Schemme. 157 Mo. 1; Spurr v. Spurr, 226 S. W. 35;
Gibony v. Foster, 230 Mo. 136; Sanford v. Holland, 276 Mo. 457;
Hahn v. Hammerstein, 272 Mo. 263; Story v. Story, 188 Mo. 110;
Tibbe v. Kamp, 154 Mo. 545. (3) By undue influence is meant the
substitution in the terms of the instrument at the time it was exe-
cuted of the will and purpose of another person or persons for that
of the testator. It is not merely the influence of affection or desire
to gratify the wishes of one who is near and dear to the testator,
but it is such influence as amounts to force, coercion or overpersua-
sion, which destroys the free agency and will power of the testator.
Hayes v. Hayes, 242 Mo. 168; Sehr v. Lindemann, 153 Mo. 276; Tibbe
v. Kamp, 154 Mo. 545; Winn v. Grier, 217 Mo. 420; Kleinlin v.
Krause, 209 S. W. 933; Hüfnagle v. Pauley, 219 S. W. 373; Lorts
v. Wash, 175 Mo. 505. (a) And contestant was required to make
affirmative proof of such undue influence either by direct facts shown,
or by facts and circumstances from which undue influence results as
a reasonable and fair inference, and not a mere conjecture. Contest-
ant having failed to show any undue influence either by direct facts
or by facts and circumstances from which undue influence results as
a reasonable and fair inference, the trial court should have instructed
the jury to return a verdict upholding the will. Sehr v. Lindemann,
153 Mo. 276; Gibony v. Foster, 230 Mo. 106. (b) Such undue in-
fluence must not only exist, but it must be shown to have been ac-
tually exercised at the time the will was executed. Tibbe v. Kamp,
154 Mo. 580; Brinkman v. Rueggesick, 71 Mo. 556; McFadin v. Ca-
tron, 120 Mo. 252; Crowson v. Crowson, 172 Mo. 691; Jackson v.
Hardin, 83 Mo. 158; Bushman v. Bushman, 279 S. W. 122. (c) As
suggestive of undue influence arising from a confidential relation be-
tween a testator and the beneficiary of his will, there is a broad dis-
tinction to be observed between those who are strangers and those
who are members of a family, as mother and daughter. In the latter
case the confidential relation is but natural and can furnish no ground
for an inference or assumption of the exercise of undue influence.
Fitzpatrick v. Cullinane, 87 Conn. 579; Dales Appeal, 57 Conn. 144;
Lockwood v. Lockwood, 80 Conn. 519; Gibony v. Foster, 230 Mo.
106; Winn v. Grier, 217 Mo. 420. (4) The fact that appellant
lived with her mother; nursed her in sickness; had a power of attor-
ney from the mother to enter her safe-deposit box, which power she

exercised only once during a period of ten years; drew money out of her mother's bank account about twenty times during a period of ten years on checks signed: "Caroline J. Peper by Estelle Peper Bushman, Atty.," none of which money she used for her personal use; deposited as other members of the family did, money of her mother in her mother's bank account to her mother's credit, were not facts sufficient to prove that appellant was the mother's confidential agent or business manager; nor did these facts cast upon appellant the burden of proving that the will in question was not the result of undue influence exercised by appellant over the mind of her mother. Winn v. Grier, 217 Mo. 420; Norton v. Paxton, 110 Mo. 467; Wood v. Carpenter, 166 Mo. 478; Loud v. Adams, 229 S. W. 158; Spurr v. Spurr, 226 S. W. 35; Sandford v. Holland, 276 Mo. 470; Berberet v. Berberet, 131 Mo. 399; Kleinlin v. Krause, 209 S. W. 933; Page on Wills, sec. 409, p. 485. But the question of whether or not appellant sustained a fiduciary relation to the testatrix is wholly immaterial, for the evidence conclusively shows that appellant did not say one word to her mother, or even suggest in any way, as to how she should draw her will, but the evidence conclusively shows that the instrument was the product of the mother's own will and not appellant's. (5) Although appellant accompanied her mother when the mother called on Mr. Haeussler to consult and advise with him with reference to the preparation and drawing of her will, appellant not being present when the preparation of the will was being discussed, nor when it was signed, that fact did not raise a presumption that the will was produced by undue influence, nor cast upon appellant the burden of explaining the provisions of the will. Teckenbrock v. McLaughlin, 209 Mo. 533; Berberet v. Berberet, 131 Mo. 399; Doherty v. Gilmore, 136 Mo. 419; Campbell v. Carlisle, 162 Mo. 647; Huffman v. Graves, 245 Ill. 445. (6) The appointment of appellant by the terms of the will in question as executrix and trustee for contestant and the minor respondent herein, does not cast on appellant the burden of proving that said will was not the result of undue influence exercised by her over the mind of testatrix. Berberet v. Berberet, 131 Mo. 399; Ryan v. Rutledge, 187 S. W. 877; McFaden v. Catron, 138 Mo. 226; Farmer v. Farmer, 129 Mo. 530; McFaden v. Catron, 120 Mo. 252; Madox v. Madox, 114 Mo. 35. (7) Unequal distribution of a testatrix of her property is not sufficient to prove or establish undue influence. Winn v. Grier, 217 Mo. 459; McFaden v. Catron, 138 Mo. 226. (8) The evidence of contestant to the effect that his mother had stated that her property would be divided equally among her three children was competent only for the purpose of showing her mental capacity or the state of her feelings, but not as truth of the facts stated. This evidence was offered not to show the condition of the mind of the testatrix,

nor the state of her affection, but to prove the facts contained in the alleged statement. Therefore the trial court erred in admitting said evidence. Bush v. Bush, 87 Mo. 486; Seibert v. Hatcher, 205 Mo. 83; Teckenbrock v. McLaughlin, 209 Mo. 547.

*N. Murry Edwards* and *McLaran & Garesche* for respondents.

(1) A suit to contest a will is an action at law and where there is substantial, although conflicting, evidence upon an issue, it should be submitted to the jury. Turner v. Anderson, 260 Mo. 1; Goodfellow v. Shannon, 197 Mo. 271; Whittlesey v. Gerding, 246 S. W. 311; McNealey v. Murdock, 239 S. W. 126; Burton v. Holman, 231 S. W. 633; Canty v. Halpin, 242 S. W. 95. (2) In considering a demurrer to the evidence at the close of the entire case, in a will contest, as in any other case at law, the evidence offered on behalf of contestant, although contradicted by that introduced by proponent, must be conceded to be true and contestant is entitled to every reasonable inference which the evidence warrants, and defendant's testimony, where contradicted, is taken as false. Whittlesey v. Gerding, 246 S. W. 312; Turner v. Anderson, 260 Mo. 1; Burton v. Holman, 231 S. W. 633. (3) It is not within the province of this court to pass upon the weight of the evidence in a will contest. Burton v. Holman, 231 S. W. 633; Turner v. Anderson, 260 Mo. 1. (4) In determining whether a will is the result of undue influence, it is proper to consider the mental and physical condition of the person upon whom the influence is alleged to have been exerted. Meyers v. Hauger, 98 Mo. 438; Ray v. Walker, 293 Mo. 468; Roberts v. Bartlett, 190 Mo. 701; Bradford v. Blossom, 190 Mo. 139; Mowry v. Norman, 204 Mo. 190. (5) The burden of proof as to testamentary capacity is always on the proponent of a will throughout the entire trial. Rayl v. Golfinopulos, 233 S. W. 1071; Carroll v. Murphy, 231 S. W. 643; Mayes v. Mayes, 235 S. W. 105; Lindsay v. Shaner, 236 S. W. 324; Chambers v. Chambers, 249 S. W. 416. (6) Where the plaintiff shows a state of facts establishing a fiduciary relation between the defendant, a principal beneficiary and the testatrix, the burden shifts, and upon proof of such a relation the law presumes that undue influence has been used. Canty v. Halpin, 242 S. W. 96; Smith v. Williams, 221 S. W. 363; Mowry v. Norman, 204 Mo. 189; Roberts v. Bartlett, 190 Mo. 701; Daussman v. Rankin, 189 Mo. 703; Carl v. Gabel, 120 Mo. 283; Wendling v. Bowden, 252 Mo. 647; Grundemann v. Wilde, 255 Mo. 115; Byrne v. Byrne, 250 Mo. 632; Kleinlein v. Krauss, 209 S. W. 936; Rayl v. Golfinopulos, 233 S. W. 1072. (7) The presumption of undue influence in cases of confidential relationship is not limited to one transacting donor's business. Any trust relation by which one establishes an influence over the mind of an-

other is sufficient. Rayl v. Golfinopulos, 233 S. W. 1072; Cornet v. Cornet, 248 Mo. 184; Smith v. Williams, 221 S. W. 363. (8) Undue influence need not be proven by direct and positive testimony, but it is sufficient if it is shown by, or can be inferred from, facts and circumstances of the evidence. Coldwell v. Coldwell, 228 S. W. 103; Roberts v. Bartlett, 190 Mo. 700; Bradford v. Blossom, 190 Mo. 139; Gott v. Dennis, 246 S. W. 225. (9) The law does not require that the overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testatrix had been acquired previously and did operate at the time of the making of the will in the disposition of testatrix's property. Gott v. Dennis, 246 S. W. 225; Coldwell v. Coldwell, 228 S. W. 103; Taylor v. Wilburn, 20 Mo. 310; Mowry v. Norman, 204 Mo. 173; 1 Underhill on Wills, pp. 187, 188. (10) The will and all of its provisions and the facts and circumstances surrounding the execution of same are proper to be considered by the jury in passing upon the question of undue influence. Ehrlich v. Mittelberg, 299 Mo. 284; Mowry v. Norman, 204 Mo. 173; Holton v. Cochran, 208 Mo. 314, 403.

WALKER, P. J.—This is a suit to contest the validity of a will. Upon a trial the jury returned a verdict that the papers submitted did not constitute the will of Caroline J. Peper and from this judgment an appeal was perfected to this court.

*The General Facts*: Caroline J. Peper, the testatrix, was married in early life to one F. W. Bushman. Later she divorced him and was permitted to reassume her maiden name of Peper. Several children were born to her of the marriage with Bushman. Upon the granting of the divorce they chose to retain their father's family name, except one son, Clarence, who used and was known by his mother's maiden name of Peper. He predeceased her, but left surviving him a son, Christian Peper, a minor and one of the beneficiaries named in the will, and hence this reference. Caroline J. Peper, who was the owner of real estate and other property in the city of St. Louis, largely inherited from her father, Christian Peper, executed the will in controversy July 14, 1919, and the codicil thereto attached, June 4, 1920. She died August 1, 1920, at the age of seventy years, leaving surviving her a son, Christian Peper Bushman, the original contestant in this proceeding; a daughter, Estelle Peper Bushman, the proponent, and the appellant here, since intermarried with one Stephen H. Barlow; and the grandson, Christian Peper, son of Clarence, as stated. Since the institution of this suit the original contestant, Christian Peper Bushman, has died, and his widow, Anna Bushman, and his daughter, Ruth Bushman, have been substituted as parties plaintiff herein. The will and the codicil at-

tached thereto, executed by the testatrix more than a year before her death, were filed in the office of the Probate Court of the City of St. Louis. Proof thereof was taken by the clerk of said court in vacation and a certificate of probate was granted. Thereafter, in term time, the probate court approved the probating of the will and the codicil.

By the terms of the will the testatrix, with the exception of certain personalty only incidentally necessary to be taken into consideration in determining the matter at issue, divided her property into three equal parts. One of these she bequeathed and devised to her daughter, Estelle Peper Bushman, now Barlow, the appellant and proponent herein; the second part she devised to her grandson, Christian Peper, a minor, the son of Clarence as stated; and the third part she bequeathed and devised to her son, Christian Peper Bushman, the contestant herein, and on his death to his son, Frederick Peper Bushman, a minor.

The bequests and devises of the second and third parts of her estate were made to Estelle Peper Bushman, as trustee, to hold and distribute to the beneficiaries named in the second and third equal divisions of the testatrix's estate with the power, for the purpose, and in the manner set forth in the will as follows:

"The parts or portions hereinabove given, bequeathed and devised to Christian Peper, son of my deceased son, Clarence F. Peper, are to be held by Estelle Peper Bushman as trustee for said Christian Peper until he becomes twenty-five years of age, the income to be used by said trustee for the benefit of said Christian Peper as to such trustee appears best. In the event of the death of said Christian Peper before he becomes twenty-five years of age, and without children, then his portion, with the accumulated income not used for his benefit, I give and bequeath to my daughter, Estelle Peper Bushman, to give to such charities or to use for such purposes as she deems best. The part or portion hereinabove given, bequeathed and devised to Christian Peper Bushman and to his son upon his death is to be held by Estelle Peper Bushman as trustee for said Christian Peper Bushman until he dies, and upon his death for the benefit of his son, Frederick Peper Bushman, the income to be used by said trustee for the benefit of said Christian Peper Bushman during his lifetime as to said trustee appears best, and after his death for the benefit of his son as to said trustee appears best, said trust to continue during the life of Christian Peper Bushman, and for at least a period of thirty years after my death, and upon the expiration of said period of thirty years after my death, provided my said son, Christian Peper Bushman, is not then alive, my said grandson, Frederick Peper Bushman, shall receive all of said portion of said estate, and in the event of the death of the said Frederick Peper Bush-

man prior to the expiration of said trust period, this portion of my estate shall be given to such Protestant charities as the trustee shall select, it being my intention to forever exclude my daughter-in-law, Anna, and my granddaughter, Ruth, from any interest in my estate.

"The trustee herein and above appointed is hereby given full power and authority to sell any portion or all of the parts or portions held by her as trustee and to reinvest the proceeds of such sales, as well as the income from said trust estate, as to her appears to the best advantage of said trust estate and to the beneficiaries thereof.

"The trustee herein is authorized and instructed to pay out of the first income which accrues and is payable hereunder to my son, Christain Peper Bushman, to Estelle Peper Bushman the sum of $532.33, being the amount due to her by Frederick Peper Bushman in accordance with an adjustment of his affairs which I have recently made.

"Fifth. I hereby nominate and appoint my daughter, Estelle Peper Bushman, executrix of this, my will and testament, and request that she be not required to give bond."

This is followed by a condition of forfeiture of the legacy of any beneficiary with a nominal gift over in the event of such beneficiary contesting the will.

*The Pleadings*: The material allegations of the plaintiff's petition are that the will of Caroline J. Peper, dated July 14, 1919, was not executed by her of her own free will, but was procured from her by undue influence exercised over her by defendant, the appellant here, through over-persuasion, coercion, force, fraud and deception, with the intent of procuring for herself, the defendant, an unjust and an unfair advantage in the control and distribution of the property of the testatrix, with the design and intent of forever preventing the plaintiff from having any control over the funds or in the management of his share of the estate of the testatrix; that for many years before the death of the latter the defendant was her constant companion, business manager and confidential agent, and as such had the exclusive management and control of the property and business matters, and that the defendant obtained from the testatrix a power of attorney to sign the latter's name to checks and thereby draw money out of various bank accounts of the testatrix, and procured from her a key to her safe-deposit box and authority from her authorizing the defendant to enter said box at any time; that the defendant collected rents and other money due and owing to the testatrix and made deposits thereof in the testatrix's bank account and at times deposited said money in her own, the defendant's, bank account and commingled defendant's own money with that of the testatrix; that defendant rendered no accounting to the testatrix and kept no record of any of the transactions between her and the testatrix of any of the money collected and deposited by her; that de-

fendant arranged for loans on the property of the testatrix and on collateral notes with banks; that defendant consulted with and advised the testatrix as to the execution of leases and other documents pertaining to the property of the testatrix and consulted with and advised her regarding the additions and improvements to be made on the testatrix's property, and as to the sale of the same and to lawsuits affecting the title to said property, and consulted with and advised the testatrix in many matters of business; that during the existence of said confidential relation, and through the power and influence the defendant was enabled to exert by reason of said relation, the defendant, with the intent and design and for the purpose as before specifically stated by the petition, was enabled to induce the testatrix to make an unjust, unfair and inequitable distribution of her property; and through defendant's power and influence over the testatrix and for the purpose of intimidating and preventing the plaintiff from contesting the testatrix's will, the defendant caused the latter to insert therein a clause of forfeiture with a gift over of one dollar if any beneficiary contested the will. It is further alleged that the defendant, through a period of years, falsely represented the real feelings of the plaintiff and his family towards the testatrix, with a view to poisoning the mind of the testatrix against the plaintiff and his family. That in the exercise of undue influence by the defendant over the mind of the testatrix the latter was induced at different times during her life to advance to the defendant large sums of money, and to sign deeds conveying to the defendant without consideration several parts or interests in certain lands in the city of St. Louis and elsewhere of the value of $500,000. That when said will was made the testatrix was aged, infirm, of unsound mind and unable to read or write without great difficulty.

The answer of the defendant denied generally the charges made in the petition. Further answering it alleges that the testatrix, who for many years was a resident of the city of St. Louis, died there August 1, 1920; that she left a will dated July 14, 1919, to which there was attached a codicil, dated June 4, 1920; the probating and recording of said will and codicil, and the appointment and qualification of the defendant as executrix of same and as trustee for the plaintiff and the minor defendants, by the Probate Court of the City of St. Louis is pleaded; that upon said appointment letters testamentary were issued to defendant as executrix.

It is also alleged in said answer that the testatrix, at the time of the execution of her will, was of sound and disposing mind, and that she signed, executed, published and declared the will and the codicil attached thereto to be her last will and testament in the presence of certain named witnesses who attached their names to the will and codicil as subscribing witnesses; that the testatrix there-

after died as aforesaid without in any manner revoking or modifying said will and codicil or attempting to revoke or modify the same. The tender of the will and the codicil for probate in solemn form is then prayed and that a judgment of the circuit court may be entered declaring and establishing the will with the codicil attached to be the last will and testament of the testatrix.

The answers of the defendant, Estelle Peper Bushman, as executrix and as trustee under the will, omitting captions, formal parts and signatures, are the same as that filed by her as principal defendant.

The answers of the minor defendants, Christian Peper and Frederick Peper Bushman, are general denials.

There was no reply to the answer of the defendant, but replies in the nature of general denials were made to her answers as executrix and as trustee.

The contestant assails the validity of the will on three grounds, to-wit: First, that the testatrix was not of sound mind at the time she made and executed the will; second, that the will is void in having been obtained by means of fraud and deceit; third, that the will was procured by undue influence, exerted by the proponent over the mind of the testatrix.

*Testimony of the Contestant*: The relevant testimony adduced on behalf of the contestant to sustain the issue submitted is in effect as follows: The proponent had lived with her mother, the testatrix, from her birth. From April, 1914, the date of the death of Fred Peper, an uncle of the proponent, she had control of her mother's household, employed the servants, directed their labor and made out checks for their payment, to be signed and which were signed by her mother. That in these matters Mrs. Peper usually conformed to her daughter's wishes. These facts were testified to by domestics, white and black, and a trained nurse who at different times had been employed in the home of the testatrix. The testimony of Mrs. Schmidt, one of the domestics referred to, covered intermittent periods of employment in the Peper household, ending about four years before the death of the testatrix. The witness's testimony in this regard being that she "guessed she had not seen Mrs. Peper for about four years before she died."

A Mrs. Ertel, another former domestic whose employment ended in October, 1916, stated that "Miss Estelle," the proponent, "employed her; that when she was paid Miss Estelle wrote and signed the checks; that Mrs. Peper was kind of feeble and couldn't write very well."

Prewitt Maupin, a colored man, employed by Fred Peper, a cousin of the testatrix, to do work about the house of the testatrix in 1913 or 1914, said he "used to go by there at different times after he quit working there; that he couldn't see much difference in Mrs. Peper

when he last saw her, except that she was a little weaker; that he had not seen her for about a year before her death.''

Ida Niederjohn, a housemaid employed in the Peper home until July or August, 1917, testified that she was employed by Miss Bushman, the proponent, and was paid by her.

Mrs. Clarence Peper testified that the proponent ran her mother's house and told her what to do and what was to be done.

Christian Peper Bushman, the contestant, testified that after the death of his uncle, Fred Peper, in 1914, the proponent ran everything about the household; that she ordered supplies, hired the help and did everything else; that during this time he transacted some money matters for his mother and attended to some of the proponent's affairs; that what he did for his mother was under the orders of his sister; that his mother did not seem to understand him and would say, ''What Estelle says is all right.'' That his brother, Clarence, who died in 1918, looked after the repairs on his mother's property and went to Estelle to get the money to pay for the same; that Estelle gave Clarence directions about repairs on the property from the time of the partition sale in 1917, when it was bought by the testatrix and the proponent. That when such repairs were deemed by Clarence to be necessary, if bids were to be taken before letting the work, he would bring them home and he and Estelle would look over them and in some cases the work would not be done if Estelle said the bids were too high. That after Clarence died his uncle, Charles Peper, looked after the property for a time, and in 1919 he, the contestant, looked after it for about six months, but that he couldn't get along with the proponent because she wouldn't pay the men he had employed and for that reason he quit. That from 1904 to the date of his mother's stroke in 1909, he attended to her banking business, but after the stroke his sister, the proponent, ''took over everything.'' That all deeds and papers after 1909 were signed by his mother at his sister's instigation; that she handled all the transactions and arranged for all of the loans.

The wife of the contestant testified that the testatrix was subject to the will of her daughter, the proponent, and would transact no matter of business without her approval; that this control continued down to Mrs. Peper's death.

Dr. Frank Fry, a specialist in nervous diseases, testified that he first saw the testatrix in a professional way when she had the stroke of paralysis in 1909, when he was called to attend her in consultation with Dr. Louis Behrens. He had no record of having seen her after the stroke in 1909 until 1919. Thereafter he saw her continuously until her death in August, 1920. After describing her physical ailments he testified that ''she had no mental trouble. Of course tempermentally and emotionally she was disturbed by a thing of

that kind because it was a constant affliction; that a paralytic stroke does not necessarily, I wouldn't say usually, affect the mind. It depends upon the character of the stroke. That where sensory action is very much disturbed it is due to brain action; that any emotional disturbance is a result of some disturbance in the normal brain action. Frequent shedding of tears or crying might be caused by this disturbance. Upon the occasions of her crying she might be thoroughly possessed of all of her mental faculties. In an emotional incident of that kind we often see people crying that don't know why they are crying; although logically they may be trying to suppress their crying and can't do it. It is a reaction that does not necessarily interfere with their reasoning powers. From my observation and treatment of Mrs. Peper I saw no evidence of defective will power about her. Of course that would depend a good deal on what she had to apply her will power and her mind to. In all the relations in which I saw her as far as I know her will was sufficient to regulate things in a normal way. She was attentive to treatment. And as far as I observed she was all right. The condition she was in would not necessarily affect her powers of resistance. People suffering a great deal who are dependent on others for immediate help are apt to slip along the lines of least resistance, more so than people that can help themselves. When I visited her in July, 1919, I think she was in bed for awhile. She was suffering a good deal and her system was generally disturbed, but after the space of a week or so she cleared up; and I think during July, 1919, she was in a position to comprehend business transactions. Her judgment was all right covering that period. I never saw her when she could not take cognizance of different pieces of property with which she was familiar. I don't believe she could have gone over a computation of the values of her property if it required a sustained mental effort without the aid of some one else. With that aid she could have done it intelligently.''

The deposition of a trained nurse, named Taylor, was read in evidence by the contestant. She was employed as a nurse for Mrs. Peper for three and a half months when the latter was stricken with paralysis in April, 1909. She was called in every two or three months after the termination of her employment to see how Mrs. Peper was getting along. In 1916 she accompanied Mrs. Peper and her daughter on a pleasure trip to Hot Springs, Virginia, New York and Washington. During the time the witness was nursing Mrs. Peper she was nervous, and the family kept all unpleasant news from her that they thought would worry her. Her daughter or her sons used to attend to everything for her. ''Her brother, when I nursed her, also took care of her affairs. She could sign checks, but that was about all she could do. Miss Estelle would write out the checks, tell her mother what they were for and she would sign them.''

It was shown by a witness named Turner, who at the time was in charge of the safe-deposit department of the St. Louis Union Trust Company, that in 1910 Mrs. Peper gave her daughter, the proponent, a power of attorney, authorizing the latter to enter her mother's safe-deposit box in said trust company. That this box continued to be rented by Mrs. Peper until her death, and was surrendered in November, 1920, by the proponent, as executrix of her mother's estate, and the contents of same were taken charge of by her.

One John Niemoeller, employed by a brokerage firm in St. Louis, dealing in investment securities, testified to records of his company showing dealings with Mrs. Peper with the firm from June, 1916, to June, 1919, when the account was closed, and the balance due Mrs. Peper was, upon her check, paid to her daughter, the proponent.

William C. Tompkins, auditor of the First National Bank of St. Louis, was examined by contestant and testified as to the signatures of Mrs. Peper and the proponent; that he had seen a power of attorney from Mrs. Peper to her daughter, authorizing the latter, as attorney, to sign checks for the former, but that he had been unable to find this paper. As attesting the exercise of this power, six checks were introduced in evidence to show, as interjected by the court, that "Miss Bushman had power to draw checks for Mrs. Peper and sign her name to them as agent." Continuing, the witness testified: "I usually transacted business with Miss Bushman. Miss Bushman, as a rule, used to do the writing and things of that kind, but her mother was always with her and usually said what she wanted, if she had anything to say."

Numerous exhibits were introduced in evidence by each of the parties which, with such other testimony not set forth as may be deemed necessary to a fair presentation of the facts, will be referred to and considered in the opinion.

A demurrer was offered to the contestant's evidence, which was overruled.

*Testimony Introduced by Proponents*: Harry H. Haeussler, lawyer, testified that at the request of Mrs. Peper and under her directions he prepared and she executed a will, dated April 1, 1919. She saw him several times in reference to the manner in which it was to be drawn. Subsequently she asked him to make certain changes in the will, and after several conferences with her he drew the will in controversy, which she signed and the same was witnessed July 14, 1919; that the only difference between the will in question and that of an earlier date was in these particulars: first, in the last will she excluded the wife and daughter of the contestant from sharing in her estate and designated them by their respective names instead of by their relationship to her, as in the first will; second, she required the sum of $532.33 to be paid to her daughter, Estelle, out of the first

316 Mo.—59.

income derived from the part bequeathed to the contestant in satisfaction of a balance due by him to his sister in accordance, as the will declares, with an adjustment she, the testatrix, had made of the contestant's affairs. Before the making of each of these wills Mrs. Peper had numerous consultations with Mr. Haeussler as her attorney. Her purpose, as frequently stated by her, was to leave her property in such a manner that it could not be forced into a partition sale and lost to everybody; that she was fearful if she left their respective shares to her sons outright they might subject the property to a forced sale and its value be greatly depreciated. The witness says he told her that the only way in which her wishes could be carried out would be by a trusteeship, and suggested that a trust company be named as trustee, but she objected on account of the great expense this would entail. After he explained this manner of bequest to her she directed him to draw the first will, naming her daughter as trustee; and when she directed him to prepare the second will, here in controversy, that the only changes made were those heretofore mentioned. At the times of the testatrix's visits to Mr. Haeussler's office and her consultations with him, her daughter, the proponent, usually accompanied her and would at times leave the testatrix at his office while she, the daughter, went out shopping and would usually not return until the consultations were over. That at no time did the daughter counsel with or advise her mother concerning the making of the latter's will or what it should contain, or offer any suggestions when that matter was under discussion. The reason for the numerous visits of the testatrix to the witness's office was that he might precisely conform to her wishes in the drafting of the will. To accomplish this he made several drafts and she finally approved the last draft, which is exemplified in the will in controversy. At these visits she would personally read each paragraph of the will as then prepared, word by word, and then have him read it to her. After making such alterations as she desired, another draft would be prepared by him, resulting, as stated, in the approval by her of the last draft, or the will in question. Ten months after the execution of this will the testatrix again called at the office of Mr. Haeussler, told him of her treatment by the half-grown daughter of the contestant, who was then living in the testatrix's home with the others of the contestant's family, and directed him to write a codicil to be attached to her will. This codicil, framed under the testatrix's direction, provided that if after a date named therein the granddaughter was permitted to remain in the testatrix's home, her presence would work a revocation of the bequests the testatrix had made to the contestant in her will of July 14, 1919. A week or ten days after the testatrix had directed the witness to prepare the codicil she called at his office, the codicil was read to her and she approved and signed

the same and declared in the presence of the witness and his stenographer that it was a codicil to her last will and testament. The witness had attended to other business for the testatrix at different times from 1912, or surely from 1915; its character is enumerated and the testatrix's connection with the same is shown. The witness stated further that at the time of executing the will the mentality of the testatrix was good, her mind sound. The stenographer, a Miss Sanguinette, in the office at the time the will in controversy was signed, stated that Mrs. Peper looked intelligent and seemed to understand what she was doing; that sometimes when she and her daughter came to the office the latter would leave her in Mr. Haeussler's private office and wait for her in the office of Mr. Haeussler's father, or would leave the office altogether.

The proponent testified that after her mother, the testatrix, recovered from the stroke in 1909 she was able, in the June following, to take a pleasure trip East with her and like trips were made several times thereafter. At one time they took the contestant and his family with them during their summer trip. That her mother was not ill after her stroke in 1909 until 1914, when she had an attack of ptomaine poisoning in April of that year and was very ill. That she recovered from this attack in about two weeks and was able to accompany the witness on a pleasure trip in June, 1914. That at different times after the death of her brother Clarence, in 1918, the contestant and different members of his family came and stayed at the home of the testatrix for months. The occasion of their coming, as stated to the testatrix by the contestant, was that he had no money to pay rent or buy food and no place to go and the testatrix took them in. He said he would supply the food, but he failed to do so. The witness testified that under the authority given to her by her mother to open the latter's safe-deposit box she exercised the privilege only once and that was for the purpose of depositing a watch therein; that she did not file the deed given her by her mother to the home property on Washington Avenue until four months after her mother's death.

The checks signed by the witness for the testatrix for the household expenses were for small amounts and were usually signed during the sickness of the testatrix, except when it became necessary to pay interest on notes due at the banks. Her mother kept no money in the house and usually paid bills with checks. The witness then stated the manner in which she paid for a two-thirds interest in the property bought by her and the testatrix at the partition sale of the land which had belonged to the estate of Christian Peper, testatrix's father, and the mortgaging of the property by them to secure the payment of the balance they borrowed to pay for the property in addition to the amount they had paid thereon in cash. That she attended to

securing the funds for her interest, and her brother Clarence attended to securing the money to pay for the testatrix's interest. That when it became necessary for the witness and her mother in the various transactions between them to sign any papers they discussed them with each other. The witness told her brother Clarence when he was attending to the making of the deed to the witness and her mother of the property bought at the partition sale, to put two-thirds in the witness's name and one-third in her mother's name. The reason for this apportionment is thus described: "I told Clarence to have the deed made in that way because my real interest in this property from my grandfather Peper's estate when we bought it in was one-fifth of eleven-twelfths and my mother's interest was one-fourth of one-fifth of eleven-twelfths. That entitled me to four times as much interest as my mother. Clarence said when I directed him as to the deed: 'Why don't you make it half and half?' and I said: 'I am paying for this property, but I will put one-third in mamma's name and I will take two-thirds and let it go at that.' By this means I was giving her back what she at one time had deeded to me; and I said: 'I will give it back this way and there will be no right for him (referring to the contestant) to say that mamma gave this to me.' The deeds disclosed the interests of the respective parties and there was no contract in regard to the property. We bought it at public sale. I could not say whether my mother got more of the rent checks on the property than I did. It made no difference, as all of the money thus received went back into the property. I took my mother down to Mr. Haeussler's office at the time of the writing of the will. My brother Clarence was gone and there was no one else to take her. I don't think she then mentioned to me the manner in which she intended to divide her property. She told me in the contestant's presence after Clarence died that she was going to make a new will and leave Clarence's little boy one-third. This angered my brother." The witness says that they objected to her mother giving the contestant shoes and clothes. "My mother also objected, but he would keep after her and she would give in to him. She used to say to herself that she was foolish to do it because he would never go to work as long as she did it. My mother used to tell my brother when he and his family were occupying the first floor of the house and were to furnish our meals, that he ought to be ashamed to bring her such food as was brought while she was supporting him and his family. I didn't live in the house after my mother died. My brother and his family lived there at my expense. I paid the gas and electric bills for three or four months, and when I stopped they let the bills run on and when they were not paid the service was discontinued. I mean I stopped paying the bills, and the companies turned the gas and electric current off. Later I went to St. Paul on

a visit. When I came back I went to my brother's a couple of nights. The gas and electricity had been cut off and I had to use a candle. He would not let me use a gas heater. I had paid his bills for months. I owned the house and he was paying no rent."

Concerning a number of checks introduced in evidence and examined by the witness it was shown that from 1911 to 1918, eighty-seven of same were made out by Clarence Peper and signed by Caroline J. Peper; that from 1911 to May, 1920, twenty-seven of same were made out by proponent and signed by Caroline J. Peper; that from 1912 to January, 1919, forty-three of same were made out by the contestant and signed by Caroline J. Peper; that from 1911 to 1918, eighteen of same were made out by Charles Peper and signed by Caroline J. Peper. The witness states that the way she came to sign her mother's name was that during her mother's sickness when she would not be able to sign them her uncle advised her to pay the bills by signing her mother's name, followed by her own as attorney. This she did in paying accounts for household expenses. That she never went through her mother's safe-deposit box; that her mother kept the keys and gave them to her once when she wanted to put something in the box; that the check for $2,206.62, given to her by the Stifel-Nicholaus Company, was not for her own personal use, but was expended for taxes, interest and repairs on the property in 1917; that her mother had a very good memory and witness used to ask her for telephone numbers. She and other members of the family found fault with the contestant at times in the presence of their mother for his begging her for money. That every pair of shoes he had up to the time of her death she bought for him. In reference to the limitation in the will that out of the first income due to the contestant $532.33 of same was required to be paid to the proponent, the witness testified: "The Levy Shoe Company were tenants of ours. My brother, the contestant, had borrowed $800 from Mr. Levy. We needed some money for interest or taxes or something, and my brother Clarence went to arrange the loan, and Mr. Levy told him that Peper (the contestant) owed him $800, that it was overdue and that Peper refused to give him another note for it, and he said he didn't like to lend any more money unless it was paid, and my brother Clarence came back and told my mother and me that we ought to pay that; that Levy said if we (the witness and her mother) would pay the $800 the contestant owed, he (Levy) would loan us the amount we wanted. I paid two-thirds of the $800 and my mother paid one-third and the loan was made. My brother never paid us anything on this debt." That her mother notified the Famous-Barr Company not to give the contestant any credit on her account; "while she didn't mention him by name she told them not to deliver anything charged to her account, except to her house, because my

brother had gotten things there and had taken them with him.''
That she and her mother, sometime in the spring of 1919, had a no-
tice inserted for a month in one of the daily (St. Louis) papers noti-
fying the public not to give the contestant any credit, or contract
with him for any improvements to be made on any of the property
owned by the witness and her mother.  That in 1915 her mother gave
her, as a gift, certain stock in the Peper Tobacco Company for tak-
ing personal care of her for many years.  The witness described—not
necessary to be set forth in detail here—how she and her mother
paid, or arranged to pay, for the property they bought at the parti-
tion sale.  The witness stated that she at no time attempted to influ-
ence her mother in the making of her will, either as to how she should
make it or who would be the objects of her bounty.

Charles Peper, a cousin of the testatrix, has for the last five or
six years been an attorney at law in the city of St. Louis.  For
twelve or fifteen years he resided at the home of Mrs. Peper.  He at-
tended to various business matters for her during these years.  He
collected her rents, looked after the repairs of her property, and
represented her on the board of directors of the Peper Tobacco Com-
pany.  He commenced looking after the collection of the rents on
the property belonging to Mrs. Peper and her daughter after the
death of Clarence Peper in 1916.  That he had nothing to do with
the collection of rents on their property at Twelfth and Market
Streets; that was attended to by Cornet & Zeibig, and later Dieckman
had charge of it.  That Mrs. Peper authorized him to act for her on
the board of directors of the Peper Tobacco Company shortly after
Clarence's death.  That before that time Clarence had represented
her on the board, and had looked after her property.  That as
long as he lived at the home of testatrix she did not ''give in to
Estelle,'' but always ''maintained her end of the conversation or
argument.''  This attitude of the parties continued until Mrs. Peper's
last sickness.  Mrs. Peper was able to look after her household af-
fairs, and to direct the servants, and to give the witness instructions
as to his manner of attending to her business matters.  That she
frequently discussed with him the affairs of the Peper Tobacco Com-
pany while he was representing her on the board of directors.  He
frequently saw the contestant at his mother's house before he moved
there with his family.  Estelle often cooked her mother's meals and
always treated her kindly.  The witness, in 1918 or 1919, borrowed
$3,500 for Mrs. Peper from the Cass Avenue Bank.  She directed
him to effect this loan and delivered to him stock in the Peper To-
bacco Company to put up as collateral.  When the loan was effected
the witness turned over the money to Mrs. Peper, and he usually made
the payments of interest as they became due on the notes at her re-

quest. At different times he made deposits of money belonging to Mrs. Peper in the banks covering a period of years. If the weather was bad or she was not feeling well Mrs. Peper would ask the witness to make the deposit for her. At times Estelle would attend to some business matter for her mother, in addition to assisting her in directing her household affairs. When a business matter required attention Mrs. Peper and Estelle and the witness would discuss it. Sometimes Estelle's and at other times her mother's judgment would prevail. Witness recalled conversations between the testatrix and the proponent concerning the conduct of the contestant's daughter towards Mrs. Peper, and said that when the proponent would say if the girl did not leave the home she would disinherit her Mrs. Peper would say she would too. "The substance of all of this was," says the witness, "that she wanted the girl to leave. At that time nothing was said about disinheriting the contestant." Witness thinks he saw Mrs. Peper write out checks two or three years before her death. Usually some one would make out the checks for her and she would sign them—usually Estelle made them out and her mother signed them. Estelle usually looked after the payment of the bills. She would examine the bill to see if it was right, fill out the check and hand it to her mother to sign. "If it was a bill in regard to the property she would have me to O. K. it." Witness couldn't say whether he received, during the last years of the testatrix's life, more bills signed by Estelle, as attorney for her mother, than those signed by the latter. In taking checks down to deposit them the witness sometimes took those of Mrs. Peper and at other times those of Estelle. Usually Mrs. Peper would tell the witness how to make the deposits, and at other times Estelle would tell him. In making these deposits he would be given the bank book of each of the parties, and the checks to be deposited would be placed in the book of the one to whom the checks were made payable. "Most of the money (checks) thus deposited was in Mrs. Peper's account. I was told how to deposit the checks. I have seen the rent account book. Estelle would usually keep this account and at times I made entries in it of payments of rent. I think the greater part of these collections were deposited to Mrs. Peper's credit. I think that Mrs. Peper and Estelle had two accounts, in the Third National, the St. Louis Union and later I believe in the First National Bank. Each had a savings account and a current account. I never heard any talk between Mrs. Peper and Estell about a will. I don't think Mrs. Peper was more feeble during the last two years of her life than she had formerly been. If my deposition says I said she was more feeble in her later years I so testified, but I do not now recall it. I can't fix the date when I heard them talking about the will. They talked on several occasions. Sometimes Christian, Clarence, Estelle and her mother

and I would be present. On these occasions Mrs. Peper would say she would treat them all fairly. I don't recall who commenced these conversations. It was shortly after Clarence's death that I represented Mrs. Peper at the factory. The par value of her stock in the Tobacco Company was $200,000. I represented her a year or two. It (the stock) was in her name. I was her representative and voted it for her.''

James C. Jones, lawyer, has practised law in St. Louis for forty years; testifying for the proponent states that he knew Mrs. Peper. When he first became her counsel it was concerning her house on Washington Avenue—she had other counsel at the time, and he was employed as associate counsel. Afterwards he had charge of the litigation until it terminated; that he saw Mrs. Peper frequently during this litigation. Thereafter he continued as her counsel in some partition suits. There was not only one piece of litigation, but a half dozen of them. Witness continuing said: ''I had frequent conversations with Mrs. Peper during the years of my employment. I think she came to me in the first instance with her brother, Charles Peper, who then lived in Louisville. She said she wanted to convey all the real estate in which she had an interest to her daughter, Estelle Bushman; that her reason for desiring to make this transfer was that the boys had been living in the house and that she had set some of them up in the automobile business and they had failed, and she didn't have much confidence in their ability to handle this property; that she was very fond of Estelle and wanted to leave her the property. The deed was prepared as she directed and I instructed her as to its recording and that she notify the other children of the transfer. She replied that she wanted to do whatever was necessary to vest the title to the property in Estelle. There were several sales of the various properties of the Christian Peper estate, the final one being in 1917. In discussing business matters with me she was calm, unperturbed and ordinarily intelligent. She seemed possessed of ordinary common sense and appreciated the character of this property. She was an entirely normal person. When she came to my office her daughter accompanied her more frequently than anyone else. I don't think she talked to me about the deed. Generally after she had the stroke of paralysis she was accompanied by some one, usually by Estelle. Sometimes when I had these conversations with Mrs. Peper, Estelle would be in the office and at other times she would not. I don't think she was present when the deed was executed. Sometimes Mrs. Peper was there with Estelle, or Charley, the brother who lived in Louisville, or with Christian Peper Bushman, the contestant. Estelle was never there when the deed was discussed, nor did she have anything to do with it. After the first sale of the property I had very little to do with her affairs. When Mr. Sulli-

van (of the witness's firm) got into the litigation, he thought that
Estelle should reconvey the Washington Avenue or the home prop-
erty to her mother, and we sent for Mrs. Peper, explained the reasons
for her so doing, and we then sent for Miss Bushman (Estelle) and
a deed for the reconveyance was made.

Morton Jourdan, witness for the proponent, has been practising
law in St. Louis for forty years, testified as follows: "I first met
Mrs. Peper prior to or about the time of the sale of the property in
which she was interested at the Real Estate Exchange; that is the
sale made by the special commissioner. I don't recall whether it was
a partition sale or not. I assume it was. I was consulted afterwards
in relation to this sale. I had consultations with Mrs. Peper, both
before and after that time. The conversations prior to the sale were
with reference to the sale which was about to be consummated, or had,
with reference to some incidentals necessary to secure money to make
the required payment in the event I should buy in the property for
her at the sale. My recollection is that the rates of interest were
discussed and the commissions which would likely be charged; there
were general conversations of that kind with her as attorney with ref-
erence to a prospective sale and what would be necessary following it.
I knew from her that she had an interest in the property and she
discussed it usually in the plural term of 'we,' and talked generally
about her interest in it, and her desire to have the property bought
in at the sale. She didn't want the property to go into the hands
of strangers. She had a very well-conceived idea about the value of
the property. She had fixed opinions about the values of property
on Twelfth Street and talked about that mostly. In these consulta-
tions we discussed the making of arrangements to borrow sufficient
money to carry the property. I don't think I ever went with her to
negotiate a loan, but representing her I went to the Mortgage Trust
Company and had several conversations with its officers with refer-
ence to loans, rates of interest, taxes and such matters as you discuss
in attempting to arrange a loan. Mrs. Peper was perfectly normal
and discussed her matters with me in a business way. She made
many suggestions about the details of the transaction. She thought
the rates of interest were high and the question as to what commis-
sion would be charged was discussed. I never had any question about
her having a complete idea and fixed opinion of all of the transac-
tions. On all of these occasions of Mrs. Peper's visits to my office,
except two, she was accompanied by her daughter. I was employed
by Mrs. Peper and her daughter to bid in the property, it being
their purpose to buy it in. My employment was restricted to that
particular work. When the property was finally sold I bought it in
and made a trip or two to the Mortgage Trust Company to look after
some details for them. There was nothing in Mrs. Peper's appear-

ance to cause me to believe that she had a paralytic stroke. While she walked slowly I saw nothing wrong with her limbs.''

Frank H. Sullivan, lawyer, has practised law in St. Louis over twenty years. ''I met Mrs. Peper professionally in 1914, or 1915, but more frequently in 1917, when I was employed by Mr. J. C. Jones to assist him in litigation in which Mrs. Peper was interested concerning the partition sale of real property belonging to her father's estate. When she first came to my office she was accompanied by her son or nephew and her daughter. I later had a much more extended interview with her in regard to this litigation. She was then accompanied by her son, the contestant, and her daughter. The subject of our consultation was her claim to residence property on Washington Avenue, which she claimed her father had given to her, but to which he did not make a deed. I examined carefully all the facts in support of her claim, and my inquiries were made to and answered by her, except now and then the son or the daughter would suggest the name of some one they thought might know something of the matter. This interview occupied about two hours. My next interview with her occurred shortly after the sale of the Christian Peper property in partition. Several persons were present at this conference. I arranged for Mrs. Peper and her daughter, who had bought in the property, for a loan to meet their payment on it, and this was the last interview I had with Mrs. Peper. So far as concerns the matter in which I dealt with Mrs. Peper her mind and memory were normal.''

At the close of all of the testimony the proponent again offered an instruction in the nature of a demurrer to the evidence, which the trial court refused to give, but by an order entered of record withdrew from the consideration of the jury the issues of mental incapacity and fraud and deceit. This ruling withdrew from the consideration of the jury the voluminous testimony offered in an attempt to sustain these issues, and left for consideration the issues of undue influence alone.

I.   The cardinal rule as to the manner in which the testimony of the contestant should be considered under the facts in this case has frequently been declared by this court as follows:

Where defendant does not stand on his demurrer to the evidence offered at the close of the plaintiff's testimony, but puts in his own evidence, a final demurrer permits a search of all of the testimony to determine if plaintiff's case is abetted by the defendant's proof. **Inferences.** In considering the demurrer therefore at the close of all of the testimony it becomes the duty of the appellate court to give the plaintiff the benefit of every inference which a fair-minded jury, of ordinary intelligence, might legitimately draw from the evidence. [Van Raalte v. Graff, 299 Mo. l. c. 525, 253 S. W.

220; Burton v. Holman, 231 S. W. (Mo.) l. c. 633; Whittlesey v. Gerding, 246 S. W. (Mo.) l. c. 311 and cases; Ard v. Larkin, 278 S. W. (Mo. App.) 1068.] A reasonable and necessary limitation upon the foregoing rule to be applied in the construction of the plaintiff's testimony upon a demurrer thereto is that the plaintiff's evidence to which credence is required to be given, must be of such a nature as to afford substantial proof of his contention. Forced and violent inferences not flowing from a reasonable interpretation of the facts shown, the demurrant is not required to admit. [Williams v. Railroad, 257 Mo. l. c. 112, and cases; Van Raalte v. Graff, 299 Mo. l. c. 526.]

II. By undue influence is meant an influence that restrains, controls, directs and diverts or coerces the will and overcomes and confuses the mind and the judgment of a testatrix. [Hayes v. Hayes, 242 Mo. 155; Winn v. Grier, 217 Mo. 420; Nook v. Zuck, 289 Mo. 24.]

**Undue Influence.**

To sustain this issue it was necessary to show that the proponent, by persuasion, suggestion, importunity or other device or machination, controlled, directed, restrained or coerced the will or confused the mind of the testatrix or overcame her power of judgment as to the true relation between herself and those who were the natural objects of her bounty in the execution of her will. [Kleinlein v. Krause, 209 S. W. (Mo.) l. c. 936; Jones v. Jones, 260 S. W. (Mo.) l. c. 793; Spurr v. Spurr, 226 S. W. (Mo.) 35.] The foregoing definition of the issue and the quantum of proof necessary to establish it are in the language employed by the contestant in his instructions and which received the approval of the trial court. Guided by the foregoing monitor and giving credence to the testimony on behalf of the contestant in the manner and to the extent required in cases of this character, does this testimony, measured as to its probative force, sustain the issue that the testatrix's will was the result of undue influence exercised by the proponent?

The proponent, then an unmarried woman, lived alone with her mother at the home of the latter, except for the presence of domestics and at times a trained nurse and the family of the contestant. The proponent, to use the language of the contestant, "ran everything about the household from 1914;" she ordered supplies, hired the help, directed their labor and made checks for their payment to be signed and which were signed by the mother; that during this time contestant transacted some business for his mother and for the proponent; that what he did for his mother was under the proponent's direction; that before Clarence Peper died in 1918 he looked after the repairs on the testatrix's property, but went to the proponent to get the money to pay for them; that Clarence always con-

sulted with the proponent about the nature of repairs and the cost of same; that contestant's mother would transact no business without the proponent's approval, and that this control continued down to the death of the mother. The testimony of the wife of the contestant, his sister-in-law, the widow of Clarence Peper, and a trained nurse are to a like effect as that of the testimony of the contestant, restricted, however, most generally, to conclusions as to the proponent's dominance in the management of the household to which the mental horizon of these witnesses was limited.

Other instances of the testatrix's conferences with and reliance upon the proponent's judgment in the conduct of business matters were introduced in evidence, many of them wholly irrelevant, to sustain the conclusion that the testatrix was under the domination of the proponent and ergo that a like domination existed when she made her will. Before discussing the probative force of testimony of this character to establish undue influence it is pertinent to repeat for the sake of clarity a portion of the testimony of Dr. Fry, a witness for the contestant, a specialist in nervous diseases, who attended the testatrix from the date of her paralytic stroke in 1909 and for some time thereafter. After testifying unequivocally that she had no mental trouble and stating specific facts in support of this conclusion, he stated that in all the relations in which he saw the testatrix her will was sufficient to regulate things in a normal way. So far as he observed she was all right. He visited her in July, 1919, when she was in bed for a while. Her system was generally disturbed, but after the space of a week or so she cleared up and during July, 1919, she was in a condition to comprehend business transactions. Her judgment was all right covering that period. He never saw her during that time when she could not take cognizance of different pieces of property with which she was familiar. Another witness for the contestant named Tompkins, an auditor of one of the banks in which the testatrix and proponent did business, testified that while he usually did business with Miss Bushman, the proponent; that her mother was always with her, and usually said what she wanted done if she had anything to say.

III. There was no evidence of any character of fraud and deceit. The withdrawal by the court from the consideration of the jury of the question of mental incapacity is conclusive. The effect of this ruling is to render inapplicable any authorities such as Ray v. Walker, 293 Mo. 447; Mowry v. Norman, 204 Mo. 173; Brad-

**Evidence of Incapacity.** ford v. Blossom, 190 Mo. 110; Roberts v. Bartlett, 190 Mo. 680 and Meyers v. Hauger, 98 Mo. 433, cited by contestant in support of his contention that it required less influence to control the testatrix's mind in the making of her will than that

of one whose mind was in full vigor. The court found, as it must have necessarily found to sustain its ruling, that no substantial evidence had been adduced to show that the testatrix lacked the required mental vigor to enable her to make a testamentary disposition of her property. This ruling was based upon a review of all of the testimony. If, however, it had been confirmed to the contestant's evidence the testimony of his two wholly disinterested witnesses, Dr. Fry and the bank officer, Tompkins, sufficed to sustain the court's conclusion. Inferences, therefore, which might otherwise be drawn, on account of a lack of mental vigor, to aid the contention of undue influence, cannot be invoked in this case.

IV. There was no direct testimony that the proponent at any time, near or remote, exercised or attempted to exercise influence of any character upon the testatrix's mind in the making of her will. A proof of circumstances is therefore of necessity relied upon by the contestant to sustain his contention. These circumstances as the evidence discloses, are as follows: that the proponent **Evidence of** assumed the management and control of her moth-**Undue Influence.** er's household; that she paid the bills, made deposits of moneys received for her mother in banks to the latter's credit, consulted with and advised her brothers and a cousin when either was attending to her mother's affairs that she had authority to sign her mother's name to checks on the latter's bank account; that she left the accounting and adjustment of her and her mother's transactions to the banks or brokers with whom they did business; that she was consulted by her mother rather than either of her brothers, when the mother sought counsel concerning her affairs; that there were conversations between her and her mother in the presence of others in which the latter's will was referred to, but that there were no consultations concerning the manner in which the will was to be made, or who were to be the objects of her bounty; that long prior thereto the proponent had received a deed from her mother to certain real estate, the latter had inherited from her father Christian Peper's estate. In addition to these circumstances, others will be adverted to which are contended by the contestant to furnish the necessary inferences to sustain the conclusion that the testatrix's will was the result of undue influence.

A reasoning by analogy based upon adjudicated cases, similar in their material features to that at bar, will best enable a right determination to be reached of the matter at issue. In the review of these cases the rule is recognized that in an action to contest a will for undue influence wide latitude in the admission of testimony is permitted. [Canty v. Halpin, 294 Mo. 96, 242 S. W. 94.] There is, however, a well defined and unvarying limitation upon this rule to

the effect that evidence to establish undue influence whether direct or circumstantial, must be of such a nature and character as to amount to overpersuasion, coercion or force to the extent of destroying the free agency or will power of the testatrix.    [Nook v. Zuck, 289 Mo. 24; Jones v. Jones, 260 S. W. (Mo.) 703.]

The proof of influence resulting from affection or attachment or the desire of gratifying the wishes of one beloved, respected or trusted by the testatrix, does not constitute undue influence and will not sustain that charge.    [Spurr v. Spurr, 285 Mo. 163, 226 S. W. 35; Turner v. Butler, 253 Mo. 202, 161 S. W. 745.]

As we said in Land v. Adams, 229 S. W. (Mo.) 158, if a testator favored a daughter because she favored him a devise to her will not be invalidated on the ground of undue influence.

In the well considered case of Hamlett v. McMillin, 223 S. W. (Mo.) 1069, in a proceeding to set aside certain deeds, it was held that the improper influence denounced by the law as "undue" does not consist in the faithful and loving performing of filial offices, as in the case at bar, however far they may extend beyond legal duty, nor can the affection and good will which comes unsought in return for such kindness be classified as an improper or undue influence. As we said in Lindsay v. Shaner, 236 S. W. (Mo.) 1. c. 323, the precautions of the law against the danger of undue influence do not foreclose to a near relative and a possible beneficiary the right to render in a case of this kind, affectionate and humanitarian service. There was no evidence that the stroke of paralysis eleven years before the making of the will, or any subsequent ailment of the testatrix, had weakened her mind or interfered with the exercise of her judgment in the disposition of her property, although it may have limited her physical activity.    Even under a state of facts more favorable to the contestant than at bar, there must be substantial evidence that the influence of the proponent over the mind of the testatrix was of such a nature as to cause the latter to shape her will to conform to the wishes of the proponent.    The proof of influence must be that it is "undue."    [Turner v. Anderson, 236 Mo. 1. c. 540.] The feelings of a father towards his children, whether of partiality or prejudice, not engendered by fraud, deceit, mental incapacity or such an influence as to subdue his mind and destroy his free agency is not sufficient to set aside a will of his property, although it be shown that the making of same was moved by the feelings referred to; and the force of the rule is not lessened by the fact that such feelings may have been unjustly harbored.    [Hayes v. Hayes, 242 Mo. 1. c. 169; Winn v. Grier, 217 Mo. 1. c. 459; Dausman v. Rankin, 189 Mo. 1. c. 703; Schierbaum v. Schemme, 157 Mo. 1.]    This rule of construction arises out of the more general one that the absolute ownership of property carries with it the right of arbitrary disposi-

tion of the same according to the untrammeled volition of the owner. By untrammeled volition in the alienation of property, we mean a voluntary act of the grantor or devisor possessing that mental capacity necessary to the validity of the act, and in the absence of fraud, deceit or such an influence as to overcome or unduly direct the free agency of the grantor or devisor.

In the case of Van Raalte v. Graff, 299 Mo. 527, 253 S. W. 223, after stating the essentials required to be shown to constitute undue influence, we differentiated the same by holding that "it must not be confused with that influence which arises from affection or a mere impulse to gratify the wishes of one beloved." Citing in addition to cases heretofore referred to, Huffnagle v. Pauley, 219 S. W. (Mo.) 375; Gibony v. Foster, 230 Mo. 106; Crowson v. Crowson, 172 Mo. 691.

We would be blind to the impulses of our common humanity as every day made manifest, if we did not, as has been frequently said by this court, recognize the fact "that it is natural and proper that persons occupying family relations should exercise some influence over each other and should remember each other in their wills. The mere fact that some influence is exercised by a person sustaining that relation does not invalidate a will unless it is further shown that such influence has destroyed the testator's free agency." [Mayes v. Mayes, 235 S. W. (Mo.) 100; Huffnagle v. Pauley, supra; Lindsay v. Shaner, 236 S. W. (Mo.) 319.] In the absence of proof of this effect on the mind of the testator, the influence will not be held to be "undue" or of such nature as to overthrow the will. [Beyer v. Lafevre, 186 U. S. 124, 40 Cyc. 1148.]

More immediately relevant to a determination of the matter at issue is the ruling of this court in the case of Thompson v. Ish, 99 Mo. 182, in which it was said: "The influence which a child may acquire from association with and attention and acts of kindness to a parent will not invalidate a will. The influence of a wife or child upon a testator, while he has power to deliberate and estimate the inducements, will not avoid the will if the influence is exerted in a fair and reasonable manner and without fraud or deception. The influence of one occupying such relation to the testator to avoid the will must be such as to overreach and destroy the free agency and will power of the testator."

In Bushman v. Bushman, 311 Mo. l. c. 576, 279 S. W. l. c. 130, which was a proceeding in equity between the same parties as in the case at bar, the purpose of which was to set aside certain deeds which had been made by their mother (the testatrix here) to the present proponent, and to appoint a receiver for the latter's estate, this court held, in effect, in denying both causes of action, that the mere fact that the grantor was old and the deeds were voluntarily made to a daughter with whom the grantor had lived for years on

affectionate terms, was not sufficient ground for canceling those conveyances in the absence of proof of mental incapacity, fraud or undue influence (citing cases). Further than this, that deeds, otherwise valid, will not be set aside because the execution of same may have been influenced by partiality or special affection by the grantor for the grantee, rather than her other children. [Goodman v. Griffith, 238 Mo. 706, 142 S. W. 259; McKissock v. Groom, 148 Mo. 459, 50 S. W. 115.]

An analysis of the testimony adduced on behalf of the contestant fails to disclose any fact or circumstance upon which can fairly be based the inference that the proponent attempted in any manner to influence the testatrix in the making of her will. Opportunity alone, however ample, does not afford a basis for such an inference. [Lindsay v. Shaner, 236 S. W. (Mo.) 319.] While it is true that undue influence need not be shown by direct proof but may be inferred from facts and circumstances, such facts and circumstances must from their nature, at least, savor of some act which by reasonable construction may be held to indicate a purpose on the part of the proponent to gain some advantage from her mother's will which would redound to her own pecuniary benefit. The entire trend of the testimony, aside from the conclusions, not statements of facts, of the contestant, is to the contrary. The will divided the estate equally between the legatees. No ground of contention can therefore arise as to an unequal division. Under the facts in this case this contention constitutes no ground of undue influence. [Gott v. Dennis, 296 Mo. 66, 246 S. W. l. c. 223 and cases.] The imposition of the trusteeship upon the proponent cannot be construed as otherwise than a burden. As such, it involves the performance of duties and the assuming of responsibilities from which any woman with a husband to care for and a home to keep, would be more likely to avoid than to seek. The creation of the trusteeship may therefore in harmony with reason and human experience, be said to have been, as the testatrix's counsel said, "at her instance," uninfluenced by her daughter, if the latter had any knowledge of it until after the will was made. The record is not silent as to the reasons impelling the testatrix to create the trusteeship and to name her daughter as trustee. She preferred an individual rather than a trust company as trustee on account of the expense of an administration by the latter. She was familiar with her daughter's fidelity to duty and her knowledge of business which would enable her to intelligently discharge the duties required of her. The son of Clarence was a minor and a proper preservation of his share in the estate required that his interest be conserved and protected by a trustee. The contestant was a spendthrift. It is not shown that he ever pursued for any considerable time a gainful vocation. He was a man in the prime of live and had a wife and two children. Either

unable or unwilling to provide them with a living he, at different times, took up his abode with his mother, sometimes accompanied by one of his children and at others by his entire family. He was continually importuning his mother for money in large and small sums, the aggregate of same after he had reached manhood amounting to several thousand dollars. Poignantly conscious of his inability to care for his portion of her estate, the testatrix needed no counsel, persuasion or other influence, and the record shows none, to impel her to so protect his interest by a trusteeship, that it might, at least, afford him and the members of his family the comforts of a home. Under this state of facts there is no room for the inference of undue influence on the part of the proponent. In short, if the mother had placed no limit upon the manner in which the contestant's share in her estate was to be protected from his improvidence, she would have demonstrated a lack of that wholesome and well directed regard for his interest and that of his family, which should characterize the conduct of a sensible and an affectionate mother. This is no more commendatory comment upon the conduct of the testatrix. It has a concrete and convincing application in the determination of the question of undue influence. The freedom of individual action of the testatrix in creating this spendthrift trust for the preservation of the interest of the contestant, is thereby made manifest, and whatever inference that might otherwise be drawn as to the existence of the daughter's influence over the mind of the mother in the making of her will, is minimized, if not obliterated.

V. No more illuminative and conclusive discussion of what constitutes undue influence is to be found in our reports than that of Judge LAMM, speaking for the court in Turner v. Anderson, 236 Mo. supra, p. 541, in which it was held in ruling against the charge that: "The proof of influence alone is not sufficient. It must be *undue.* Nay, the proof of such overmastering influence of one spouse over another as might mould and guide the will of the other is not sufficient. There must be evidence that such **Inferences of** influence was brought to bear, and that the effect **Undue Influence.** was produced or sprang naturally by way of inference from facts proven. Conceding that undue influence cannot as a rule be proven by direct and positive testimony, but oft must needs rest in inferential proof, yet we have read this record in vain to find such inferential proof. Undue influence to be effective in breaking a will should be of sufficient potency to destroy the free agency of testator at the time of making the will. The influence of natural affection is not sufficient; for natural affection may flow at all times and its waters are under no ban known to the law. The undue influence that will break a will must be present, in active exercise and rise to the mark of

316 Mo.—60.

such overpersuasion, coercion, force, fraud or deception, as breaks the will-power of testator and puts in its stead the will of another. [Techenbrock v. McLaughlin, 209 Mo. l. c. 521, and cases cited; Fulton v. Freeland, 219 Mo. 494.] We have time and again taken occasion to say that the only object of the Statute on Wills is to permit the owner of property to take it out of the Statute of Descents and Distributions and to dispose of it unequally by his domestic decree, in which decree he sits as a chancellor on the equities of his heirs and his own domestic affairs. An unnatural will cannot be broken merely because unnatural. Its harshness and unnatural features only operate when coupled with present facts tending to show undue influence when that is the issue, or testamentary incapacity when that is the issue. A testator when writing his will need not write it as a supplication to a jury, viz: 'I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.' [Lynch v. Doran, 95 Mich. l. c. 409; Conner v. Skaggs, 213 Mo. l. c. 249; Meier v. Buchter, 197 Mo. l. c. 86, et seq.]''

In an earlier case of Teckenbrock v. McLaughlin, 209 Mo. l. c. 551, the same learned judge, in holding that no evidence had been introduced to sustain the charge of undue influence, said: "There must be somewhere proof of undue influence itself either in fact or presumptively. To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the will. It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present and in active exercise overpersuasion, coercion or force, fraud or deception, breaking the will power of the testator. [Myers v. Hauger, 98 Mo. 433; Doherty v. Gilmore, 136 Mo. 414; Schierbaum v. Schemme, supra, Tibbe v. Kamp, 154 Mo. l. c. 579; Wood v. Carpenter, supra; Crowson v. Crowson, supra; McFadin v. Catron, 120 Mo. l. c. 275.]''

The fact that the testatrix designated the proponent as the trustee and executrix in her will will not support an inference of undue influence. We so held in Ryan v. Rutledge, 187 S. W. (Mo.) l. c. 878. In that case the draftsman of the will concededly sustained a fiduciary relation to the testator and was made executor and trustee which was held to be no evidence of undue influence. Nor does the fact that the testatrix had given the proponent certain personal property and had years before the making of the will deeded the real estate described in Bushman v. Bushman, supra, and which the court held to be valid transfers. It is not enough to constitute undue influence that the proponent possessed and exerted an influence over the testatrix in the management of the latter's business affairs alone in order to shift the burden of explanation on her, but it must be shown that she procured the execution of the will by the exercise of such an influence as to thereby gain an unfair advantage for her-

self. The testatrix's mental capacity to make a will being beyond question she had the right to make such a will as she chose, although that will might have been injudicious, unreasonable and unjust. [Berberet v. Berberet, 131 Mo. l. c. 411; Farmer v. Farmer, 129 Mo. 530; Jackson v. Hardin, 83 Mo. 185.] It is not necessary, however, to resort to the rule of construction in its fullness, as set forth in the cases cited in the foregoing paragraph, to sustain this will. There was no unequal distribution of the testatrix's estate. The manner of its enjoyment by the legatees was one of preservation and not of unfair distribution. Under no reasonable construction can it be said to redound to the advantage of the proponent. This being true no inference can justly be drawn, in·the absence of any relevant testimony on the subject, that she exercised an undue influence upon her mother in thus providing for the distribution of her estate.

VII. However, it is contended that a fiduciary relation existed between the mother and the proponent, and despite the fact that no direct evidence or relevant inference are adduced to sustain that **Fiduciary Relation.** contention, that the existence of the same may be presumed from the long continued intimacy of the parties, the confidence in and reliance upon the proponent by the testatrix and the manner in which the proponent attended to the affairs of her mother. This assumption as we have shown rests upon facts entirely at a variance from those in the case cited by contestant in which it was held that a fiduciary relation existed. In those cases the facts and circumstances upon which the conclusion as to the existence of the relation was based, were from their nature indicative of such a reliance, confidence and intimacy as to authorize the inference of the existence of the relation. In the instant case while the relations of the parties have been subjected to a Paul Pry scrutiny of the personal life and conduct of the testatrix and proponent, extending over a decade or more before the making of the will, their intimacy, confidence in and reliance upon each other discloses no indication, much less an attempt, of the proponent to influence her mother in the making of her will. In the condition of this record, however, it is not material, except to fix the burden of proof, whether a fiduciary relation existed or not. When the contestant had introduced his testimony the proponent went forward and assumed the burden of showing that no influence of any character had been exerted by her upon her mother in the latter's disposition of her property. While testifying unreservedly to every phase of her relations with her mother through the years of their intimacy and to the nature and extent of her activities in behalf of the latter in attending to her business, there is not only no indication, much less evidence, that she attempted in any manner to influence the making of her mother's will. The testimony of other witnesses for the proponent, set forth in detail in the state-

ment of facts, is to the same effect as that of her own. A review of same shows affirmatively that she not only did not exert or attempt to exert any undue or other influence upon her mother in the making of the latter's will. Any presumption, therefore, of undue influence, based upon the existence of a confidential relation between the mother and the daughter was thereby rebutted. Once having been rebutted it disappears.

So far, therefore, as this record discloses, neither by direct testimony or relevant inference, does the contestant's testimony prove or tend to prove undue influence, while the affirmative testimony of the witnesses for the proponent, who in this regard assumed the burden of proof, shows that no such influence existed.

VIII.  Another fact of more than persuasive force in determining the matter at issue is the making by the testatrix of a former will in April, 1919, three and a half months before the execution of the will in controversy. The former will was identical in all of its provisions, except two minor particulars referred to in the statement of facts, with the present will. The earlier will was introduced in evidence by the proponent without objection on the part of the contestant as tending to show an absence of undue influence in the making of the present will. That no improper influence was urged or employed in the making of the former will is a conclusion authorized by the consent of the contestant to its introduction in evidence for the purpose stated. The former will, as an evidentiary fact, defined the purpose and intention of the testatrix, free from any influence, in the testamentary disposition of her property. Her subsequent purpose and intention in this regard having been shown to be the same in the present will as in the former one tends to show that the latter was not the result of undue influence. [Thompson v. Ish, 99 Mo. l. c. 171; Jackson v. Hardin, 83 Mo. l. c. 184; Lindsey v. Stephens, 229 Mo. l. c. 617, 129 S. W. 641; Yant v. Charles, 219 S W. (Mo.) 572.]

*Former Will:*

There is no statement of facts as required by the statute and our rules. This defect has necessitated a laborious examination of more than eight hundred pages of testimony, much of it trivial in its nature and irrelevant in its character, to enable a statement of the material facts to be made. In addition, we have reviewed the assignments of procedural errors, but the proper disposition of this case does not require that our conclusions in regard thereto be embodied in this opinion.

In the absence of any substantial evidence to sustain the issue of undue influence, the judgment of the trial court is reversed and the cause is remanded with the direction that a judgment be entered establishing the paper writing of July 14, 1919, and the codicil attached thereto of January 4, 1920, as the last will and testament of Caroline J. Peper. All concur.