EMMA D. FRYE, RESPONDENT, v. ST. JOSEPH RAILWAY, LIGHT, HEAT AND POWER COMPANY, APPELLANT.—99 S. W. (2d) 540.

Kansas City Court of Appeals. November 9, 1936.

*Randolph & Randolph* and *Nile L. Vermillion* for respondent.

*Mayer, Conkling & Sprague* and *Edward B. Wilkinson* for appellant.

SHAIN, P. J.—This is an action for damages brought by plaintiff against defendant for alleged wrongful death of her husband.

The defendant operates a line of electric railway between St. Joseph, Missouri, and Savannah, Missouri, and owns and operates railway cars for the transportation of passengers, these cars being propelled over the rails of said road by electric power, said road runs in a northernly direction out of St. Joseph to Savannah.

On June 28, 1935, and at about 12:30 A. M., while defendant was operating its passenger car in a southernly direction, a short distance south of an intermediate station known as Industrial City, the plaintiff's husband was run over and killed by said passenger car.

The petition of plaintiff pleads all necessary facts for a recovery under the humanitarian rule.

The defendant answers by general denial and plea of contributory negligence.

The case was tried and determined upon the humanitarian rule alone.

It appears that John T. Simmons, the agent of defendant and operating motorman at the time of the occurrence, was the only eye witness to the accident. The plaintiff used Mr. Simmons as a witness.

A part of the direct examination is as follows:

"Mr. Randolph: I am calling him for the purpose of interrogating him, he being the agent for the defendant in this case.

"Q. Mr. Simmons, were you driving the interurban car at the time Mr. Frye was struck? A. Yes, sir.

"Q. You have been sitting here at the counsel table on the defendant's side of the table in this case? A. Yes, sir.

"Q. Was it the morning of the 28th of June that this occurred, shortly after midnight? A. Yes.

"Q. What kind of a headlight did that car have? A. It had an arc light, electric arc light, carbon light.

"Q. How far ahead of that car does that headlight shine? A. About seven or eight hundred feet.

"Q. And on the night this occurred was that light turned on and shining with its usual brilliancy? A. Yes, sir.

"Q. Did you have a clear view down the track ahead of you? A. Clear view?

"Q. Yes. A. All except the weeds in the track and the rain on the windows was clear.

"Mr. Randolph: I want to show—I am now surprised by the testimony of the witness for the reason he is changing his answer from what it was heretofore made and I ask leave to ask him impeaching questions because the testimony he has now given in answer to this question is different from the testimony given at a previous time. I ask leave to ask impeachment questions for the reason he formerly answered it 'Yes.'

"The Court: I don't think where he is the agent of the defendant you have to ask permission but if you want it I will give it.

"Q. I want to ask you if at the time your deposition was taken you were asked this question: 'Could you see clearly down the track ahead of you with that headlight on that trip' and you made the answer 'Yes.' A. You could; you could see ahead.

"Q. Clearly? A. You could see except for the water on the windows. I told you it was raining.

"Q. I am asking you if when your deposition was taken you were asked this question, 'Could you see clearly down the track ahead of you with that headlight on that trip,' and whether you answered 'Yes'? A. Yes.

"Q. You have driven those cars, all of them? A. Yes.

"Q. They all have the same kind of headlights? A. Yes, sir.

"Q. And all of the headlights operate the same or practically the same? A. Yes.

"Q. And all of them have the same brilliancy to speak of? A. Yes, sir.

"Q. Now, will you tell the jury if you saw Mr. Frye on this track ahead of you? A. I saw him 20 feet before I hit him.

"Mr. Conkling: How much? A. About 20 feet in front of the car.

"Q. Tell the jury whether or not he was walking with his back to you at the time? A. No.

"Q. What was he doing? A. He was lying across the rail on his face.

"Q. In what manner was he lying? In what position was his body, did you say? A. He was lying across the east rail just about here

(indicating) over the rail with his face down in the weeds in the grass.

"Q. In the weeds? A. Yes, sir.

"Q. Were there any weeds there? A. Yes, sir.

"Q. Where did you see weeds? A. They were all over the track there.

"Q. All over? A. Yes, sir.

"Q. Between the track, too? A. Yes, sir.

"Q. You could not see the ground? A. There was weeds across all over the track."

It will be seen from above that plaintiff was permitted to fully cross-examine this witness. The defendant is shown as objecting and excepting to same. In examining Mr. Simmons concerning his testimony at the coroner's inquest, the following appears:

"Q. I thought you said his body about here (indicating). A. He was, his body right here (indicating). Right at the shoulders.

"Q. Why did you say with his head right along the rail? A. His head was hanging right along over the rail.

"Q. Why did you make this statement? 'The man was lying right near the rail.' What did you mean by that if he was lying across the rail? A. I don't think I made that kind of a statement. I don't remember of making that statement because he was lying across the rail."

Concerning the handling and stopping of the car, Mr. Simmons testified as follows:

"Q. In what distance did you stop the car after you saw this man's body across the rail? A. About 91 feet.

"Q. About 91 feet? A. Yes, sir.

"Q. And did you stop the car with safety to the passengers there were on it yourself—A. (interrupting) I stopped it as quick as I possibly could.

"Q. How fast were you running as you came through Industrial City? A. Probably 12 or 15 miles an hour.

"Q. And then after you passed through, how fast did you continue—how far did you continue that 12 or 15 miles an hour? A. Until I got past Roseler's place.

"Q. Then what did you do? A. Sped the car up.

"Q. Was it raining a little that evening? A. Yes, sir.

"Q. Raining slightly or a lot? A. Just slightly.

"Q. Did you stop your car just before you got to Industrial City and wipe your windshied off? A. At Stop 8.

"Q. You wiped your window off so you could see good? A. Yes, sir."

Simmons estimated his speed at the time was between twenty-five and thirty miles an hour.

It is shown that Simmons in a deposition when asked if he could see clearly down the track had answered, "Yes." Before signing the deposition he had stricken out the "yes" and inserted something in his own handwriting which could not all be made out. In explanation the witness explained, in effect, that when he read that part of the deposition it did not express what he meant.

The witness's final version of the incident is expressed as follows:

"A. His body was lying in the weeds and grass and was impossible to see it until I was in 20 feet of it although I had been looking straight ahead all the time.

"Q. Well, if you were looking straight ahead what was to keep you from seeing it? A. The grass and the weeds in the dark.

"Q. Those weeds were clear across the track? A. Yes, sir.

"Q. How high were they? A. Well, the pilot is 8-½ inches above the rail and the pilot brushes them off, and the rail is 6 inches high makes 14½ inches."

It is shown that Simmons had testified in his deposition that he had not touched the body. On the witness stand he stated he had touched but not disturbed.

The plaintiff introduced witnesses of user of defendant's tracks by people going to and from Industrial City and other points which evidence is sufficient to a conclusion that there was a duty of lookout at the scene of the accident.

It appears that defendant's tracks parallel a public highway. Concerning the conditions existing as to grass and weeds obstructing vision of motorman, a Mr. Peters, plaintiff's witness, on cross-examination testified as follows:

"Q. Between the edge of the highway, the edge of the pavement and the edge of the ties there is a space in there where grass and weeds grow up? A. Yes, sir.

"Q. And was at this time last summer? A. Yes, sir.

"Q. When this happened? A. Yes, there is grass grows up there.

"Q. Grass grew along in the track, did it not? And weeds? A. I would not say they grow in the track, no, because that is generally smoothed down. The center of the track was generally clear.

"Q. I don't mean they grew up high but they grew up to where the bottom of the pilot of the interurban cars kept them down? A. Yes, sir. They grew up pretty close to where the interurban would hit them as it passed but the center was clear, you might say clear. I don't know.

"Q. You don't mean to say that no grass or weeds grew in between the two rails? A. Some did but not a great deal.

"Q. The place I am talking about is down about 100 feet north of this road which runs west and which you and I will call Stop 4. A. Yes."

The accident involved, happened at what is designated as Stop 4. A Mr. Stockton was called as a witness by plaintiff and testified that at that locality there was a straight track looking north a distance of at least 400 feet. In this witness's direct examination the following questions and answers appear:

"Q. Is there anything that obstructs the view after the car rounds the bend up and Industrial City south to Stop 4? Anything to shut off the view of the track? A. Not that I know of."

While Mr. Stockton was on the stand, plaintiff began inquiry as to lights of defendant's cars and as to general conditions of visibility in the vicinity of the accident. Before being permitted to fully testify, defendant was permitted to make inquiry as follows:

"Q. The time that you had in mind when you answered his question, where were you standing? A. Where was I standing?

"Q. Yes. A. Up in front.

"Q. And what time of night was it? A. Well, that depends.

"Q. It don't depend. It depends on the facts only. What time of night was it? You can answer the question? A. Well, 11 o'clock.

"Q. When was this occasion? A. That was last fall and about two weeks ago I rode the car and came down about 10:30 or 10:00.

"Q. About two weeks ago? A. Yes, sir.

"Q. And on that occasion there was snow on the ground was there not? A. I believe so.

"Q. And there weren't any weeds, were there? A. Not at that time.

"Q. Now, the time you spoke of last fall, give me the month? A. Beg pardon.

"Q. Give me the month last fall you spoke of? A. In September.

"Q. What time of night was it? A. Between 11:00 o'clock and midnight, just as soon as I could get away.

Q. What car did you leave on from Savannah? Eleven o'clock. I think it was the 11:00 o'clock car I left on. I always tried to get the 10:00 but I could hardly have made it. It was the next car that I got if that was 11:00 o'clock. I don't know what hour. I think it was about 11:00.

"Q. Did you make any ride on the interurban car at Mr. Randolph's request? A. No, sir.

"The Court: That is getting past the qualification.

"Q. This time last fall that you rode down and you turn your mind back to now and had in mind when you answered his question, what was the weather condition? A. It was good.

"Q. The weather conditions were good? A. Yes, sir.

"Q. Clear night? A. Yes, sir.

"Q. Not raining? A. No, sir.

"Q. Did you ever ride down at all such as this night when it was raining? A. I don't recall.

"Q. The visibility was pretty good? A. Yes, sir.

"Q. No fog? A. No, sir, it was quite clear.

"Q. No rain? A. No."

Defendant after this inquiry made objection and exception based upon the fact of conditions on the night of occurrence was entirely different from time being testified concerning.

Objection was overruled and witness testified as follows:

"Q. Now, you may answer the question—how far do they throw out a light ahead of the car? A. Well, I don't hardly know. I imagine between four and five hundred feet it looks to me like. I noticed it in several different places.

"Mr. Conkling: I move that the 'imagination' of the witness be stricken from the record and the jury instructed to disregard it.

"The Court: That will be stricken and the jury is instructed to disregard that testimony.

"Q. Not what you imagine, but what you observe. Can you gauge it by telephone lengths? A. I would say four telephone pole lengths.

"Q. State whether or not the light spreads, too?

"Mr. Conkling: Where?

"Q. The lights from these interurbans—do they spread out?

"Mr. Conkling: Do you mean as they get away?

"A. It does on a straight track but not on the curve.

"Q. State whether or not it throws the light down to the ground in front as well as straight out? A. It throws it low on the track."

On cross-examination the witness testified that he did not know the conditions on the night of the accident.

On cross-examination of Mr. Simmons the following questions and answers appear:

"Q. You said you saw something on the track when you were 20 feet away? A. Yes.

"Q. Did you see anything at all on the track before you got within 20 feet of it? A. I did not.

"Q. Were you looking ahead all of the time? A. Yes.

"Q. Tell the jury why it was impossible to see anything. A. On account of the grass and the weeds in between the rails and my light shines on them and it makes a shadow on the other side.

"Q. Was it raining up to the time and including the time of the accident? A. Yes, it was raining when the accident happened.

"Q. Could you see good? Was the visibility good? A. No.

"Q. Was there any fog? A. Some fog through the flat there. It was along the creek.

"Q. When you first saw something at which time you have stated to the jury, the car was 20 feet away from the body, did you know then that it was a man? A. No. I could not tell at once what it was.

"Q. Without regard to whether you knew it or not, did you instantly apply your brake? A. Yes, sir.

"Q. The car has air brakes? A. Yes.

"Q. Tell the jury whether you put it in emergency or otherwise? A. Yes, sir, I throwed it in emergency.

"Q. Did you do that instantly you saw something? A. The second I saw it.

"Q. Did you thereafter stop the car in the shortest time possible under the circumstances? A. Yes, sir.

"Q. Was the car running downhill at the time this occurred? A. Slightly downhill.

"Q. Did you see Mr. Frye, or his body there, as soon as you should see anything? A. Yes, sir."

Earnest Cook, a photographer, was introduced by plaintiff and he identified three photographs taken at the scene of the accident on August 28, 1935. These photographs in evidence as Exhibits A, B, and C show little grass between the rails.

James Cahill, after the introductions of photographs, was recalled by plaintiff and testified that the pictures correctly show conditions at the scene of accident.

This witness further testified as follows:

"Q. Now, tell the jury whether there were any weeds 8 inches high or 14 inches high that morning along the east side of those rails or between the rails? A. None in between and the ones on the edge of the track right even with the track weren't over that high (indicating).

"Q. You indicate how high? A. About 3 inches."

Mr. Degen was recalled and testified that there was some grass and weeds between the rails but not over two or three inches high.

Defendant recalled Mr. Cook and identified photographs of the scene of the accident taken June 28, 1935. These photographs were offered marked Exhibits 1-2-3-4 and 5. The photographs were taken from various positions, none directly down the track. These photographs show more obstruction by weeds than do defendant's Exhibits A, B and C.

After defendant offered the photographs, as a part of the cross-examination of Mr. Cook, Mr. Cook on inquiry from plaintiff testified that defendant's Exhibit 1 to 5 were taken from a position east of the defendant's track.

At this point plaintiff and defendant rest.

Defendant offered demurrers at the close of all the evidence, same were refused. Defendant making objection and exception.

Thereafter case was submitted to a jury and the jury returned a verdict for the plaintiff in the sum of $5000. Judgment was had and entered for said sum of $5000. From this judgment defendant has duly appealed.

## Opinion.

Defendant assigns as error the court's refusal to give its instructions, in nature of demurrer, directing verdict for the defendant.

The consideration of this specification requires that we give careful consideration of all the evidence in its most favorable light for plaintiff. To an understanding of our conclusions, we have set out herein very fully, and often by quotation, from the record, the evidence. throwing light upon the application of the humanitarian doctrine, upon which alone the case was submitted.

The evidence clearly shows contributory negligence upon the part of deceased. However, as that element is eliminated we refrain from embracing herein the evidence that only goes to that issue.

The question to be determined herein is clearly: Is there any substantial testimony tending to show or from which it can be fairly inferred that the defendant either saw, knew, or by the exercise of due care could have seen or known that the deceased, at the time and place and under the facts and circumstances shown in evidence, was in the imminent position of peril, in which the deceased is shown to have been, in time, by the exercise of ordinary care on defendant's part and with the means at hand and without jeopardy to himself and passenger, have stopped the car and avoided running over said deceased?

The motorman was the only eye-witness. He was called as witness by plaintiff. Based upon this witness's testimony alone with one exception there could be no recovery by plaintiff. Further, if plaintiff be firmly bound by this testimony the same would defeat recovery. However, under the circumstances, the witness being agent of defendant, great latitude was given as to cross-examination that we conclude was justified, and the jury were justified in accepting or rejecting any part of the whole of his testimony.

From the verdict reached, we must conclude that the jury did reject said witness's testimony or many essential points and did give to plaintiff benefit of said witness's testimony that was favorable to plaintiff.

Undoubtedly the jury disbelieved the motormon's testimony to the effect that weeds, other than from two to three inches high, and weather conditions were such as to preclude the witness from seeing deceased before he was in twenty feet of him.

In the absence of any other testimony, the evidence is conclusive to the effect that the least possible distance in which the car could have been stopped, with safety to witness and passengers, is ninety-one feet. In other words, there is no evidence in the case that will permit any conclusion that the car could have been stopped short of that distance.

As before stated, there is such evidence of user as justifies conclusion of duty to keep a lookout. However, in order to justify a

recovery there must be evidence from which the jury can be justified in inferring that the motorman in the exercise of due care did or could have seen deceased in the position he was in for a distance of ninety-one feet.

In the record before us we find but the evidence of one witness that is potent to the conclusion above.

When Mr. Simmons the motorman was on the stand and when being cross-examined by the defendant, the following questions and answers appear:

"Q. At the time that you were running from the county line, or from Industrial City down to where this accident occurred, were you looking out ahead all the time? A. Yes.

"Q. Was your headlight in good condition? A. Yes, sir.

"Q. Mr. Randolph asked you whether you could see clearly with that headlight. Tell the jury whether you could have seen an automobile on the track with that headlight four or five hundred feet away? A. Yes.

"Q. Could you have seen a man standing up on the track? A. Yes.

"Q. Could you have seen a man sitting down on the track? A. Yes, I could have seen him sitting down."

It is the policy of our Appellate Courts to not disturb findings of facts based upon reasonable inference from competent evidence.

We conclude that, based upon the above testimony of the man who was operating the car upon the occasion and who knew existing conditions as they existed at the time, the jury can be upheld in inferring from said evidence that the conditions of visibility testified to were such as the motorman by exercise of ordinary care could have seen deceased upon the track in the position in which he was laying at a distance of over ninety-one feet in front of the car. Based upon the above conclusion, we conclude that the evidence presented a submissible case and that the court's refusal of defendant's peremptory instructions does not present reversible error.

The case at bar is distinguished from Voorhees v. Railroad Co., 325 Mo. 835, and like cases for the reason that in the case at bar there is substantial evidence of user.

Defendant urges that it was error to permit witness Stockton to testify as to observation made at a different time and under different conditions than existed on the night of the accident.

It is manifest that Stockton's testimony is of but little probative value.

As the testimony of this witness, as to the visibility, was not as favorable to plaintiff as was the testimony of the motorman on his cross-examination, we conclude there is no reversible error shown.

Defendant claims error in the giving of instruction number three on behalf of plaintiff. The instruction is in usual form as to credibility

of witnesses and contains the following clause to which defendant's point is directed:

"And in this connection, you are instructed that if you believe that any witness has wilfully sworn falsely to any material fact in issue in this case, then you are at liberty to reject the whole or any part of the testimony of such witnesses."

We conclude that the qualifications and changes made by the motorman after his testimony had been taken and transcribed was as to such a material issue in the case, that the above language in instruction three does not present reversible error in that the instruction included that *all* of the facts and circumstances in evidence should be taken into consideration in determining as to truth or falsity.

In Missouri we have adopted and adhere to a very liberal last chance doctrine. Our doctrine is ultra humanitarian. An examination of the record in this case discloses that there was an orderly and painstaking trial. The case presents close questions of law and fact. We conclude that there was a fair trial of the issues presented and conclude that the trial court did not err in refusing a new trial. Judgment affirmed. All concur.

## ON MOTION FOR REHEARING.

BLAND, J.—In addition to that part of the testimony of the motorman set out in the original opinion, he testified as follows:

"I could see down the track but I could not see on the track and for that reason I changed that. I could have seen a man standing up or a man sitting down—I could have seen that—but I misunderstood if you could see down the track. I could see down the track but I could not see anything laying down on the ground in the grass.

"Q. Up until the time this occurred had you made a stop since you left Savannah? A. Just the one at Stop 8 when I cleaned the windows.

"Q. Stop 8 is the county line? A. Yes, sir.

"Q. Was it raining before you got to Stop 8? A. Yes.

"Q. And at that time was it getting difficult to see through your front window? A. Yes, sir.

"Q. And you stopped there and did what? A. Cleaned the window.

"Q. How far is it from the county line to Industrial City? A. Probably half a mile.

"Q. By the time that you had gotten down to—coming to Stop 4, was there water again on your window? A. Yes.

"Q. And it was difficult to see through? A. Yes, it was hard to see through.

"Q. At the time you were running from the county line, or from Industrial City down to where this accident occurred, were you looking out ahead all the time? A. Yes.

"Q. Was your headlight in good condition? A. Yes, sir.

"Q. Mr. Randolph asked you whether you could see clearly with that headlight. Tell the jury whether you could have seen an automobile on the track with that headlight four or five hundred feet away? A. Yes.

"Q. Could you have seen a man standing on the track? A. Yes.

"Q. Could you have seen a man sitting down on the track? A. Yes, I could have seen him sitting down.

"Q. How was Mr. Frye lying? Just tell the jury so they may thoroughly understand it. A. Lying right across the east rail just about here as near I could tell with his head on his face down in the weeds, and his feet was back over next to the other rail.

"Q. What was the color of his clothing? A. He had a dark-like shirt on. Looked like a blue shirt.

"Q. What was the color of the rest of his clothing? A. Dark.

"Q. How far out ahead of your car did the ray of your headlight hit the rails? A. Well, I expect it hits about five or six hundred feet away? A. Yes.

"Q. And at the time that ray of your headlight hit the rails where Mr. Frye was lying tell the jury if you were able to see anything at all on the track? A. No, you could not see.

"Q. Was there anything to indicate to you there was anything or anybody on the track? A. No.

"Q. From that time forward up to the time the accident occurred did you continue to look straight ahead? A. Yes, all the time.

"Q. You said you saw something on the track when you were 20 feet away. A. Yes.

"Q. Did you see anything at all on the track before you got within 20 feet of it? A. I did not.

"Q. Were you looking ahead all of the time? A. Yes.

"Q. Tell the jury why it was impossible to see anything. A. On account of the grass and weeds in between the rails and my light shines on them and it makes a shadow on the other side."

In its motion for a rehearing defendant says that we have held that an inference could have been drawn by the jury, which defendant says, would be a wholly unwarranted one and, even if it properly could have been drawn by the jury it took flight in view of the direct and positive testimony against the inference. The inference alluded to, of course, is to the effect that there was sufficient visibility for the motorman to have seen deceased in time to have stopped the car before running over him.

We do not think the inference suggested is either an unwarranted or unreasonable one nor do we think the evidence was such that the jury could not have indulged the inference at the end of the case.

It will be borne in mind that we are here dealing with an inference and not a presumption. There are some cases which refer to a pre-

sumption as an inference and others which refer to an inference as a presumption. This has caused considerable misunderstanding of the two terms. As was stated in Merkel v. Ry. Mail Assn., 205 Mo. App. 484, 492:

"There has been some confusion due to the inaccurate use of the words, 'presumption and inference,' which in some instances has left the impression that presumption and inference are synonymous, whereas these words have distinct and separate meanings. The word 'presumption' in the strict legal sense 'should be applied only to a presumption of law,' and as such may be defined as 'the deduction which the law expressly directs to be made from particular facts,' whereas inference as distinguished from presumption of law is 'a deduction which may be made from any facts legally proved.' 'The difference is that a presumption is a mandatory deduction, while an inference is a permissible deduction which the reason of the jury makes without an express instruction of law to that effect. [1 Jones on Evidence, 59.]"

It has often been said that where plaintiff relies on a presumption and the facts are made to appear the presumption takes flight.

However, when there is evidence, as here, upon which the jury may draw an inference they may draw it even though there be a host of witnesses who testify directly to facts contrary to or conflicting with such inference. [Bond v. St. Louis-San Francisco Ry. Co., 315 Mo. 987, 1002; State Hospital v. Cole County, 272 Mo. 135, 140.] Of course, such an inference must be a reasonable one and not a forced or violent one nor one amounting to mere speculation. [Bushman v. Barlow, 316 Mo. 916, 939; Keim v. Blackburn, 280 S. W. 1046, 1048.] The inference sought to be relied upon in George v. Mo. Pac. R. R. Co., 213 Mo. App. 668, cited by the defendant rested upon pure speculation in view of all of the testimony. Such is not the case here.

However, defendant says that plaintiff is bound by the testimony of the motorman that he did not and could not have seen deceased in time to have stopped the car before running over him. In this connection defendant relies upon the well known rule that a party is bound by the testimony of a witness he places on the stand in the absence of any contradictory testimony. [See Orlann v. Laederich, 92 S. W. (2d) 190; Raw v. Maddow, 93 S. W. (2d) 282; Lolordo v. Lacy, 88 S. W. (2d) 353; Walradt v. St. Jos. Ry. Light, Heat & Power Co., 48 S. W. (2d) 93.] Defendant says that the testimony of the motorman that he could not have seen deceased is not disputed. We think defendant is in error in this contention. Defendant gives no substantial weight to the testimony of plaintiff's other witnesses that the weeds in the track were not as high as the motorman stated. From the testimony of these other witnesses it would appear that the weeds were not of sufficient height or density to materially interfere with

the motorman's view of deceased. It will be borne in mind that the motorman laid great stress on the fact that the vegetable growth, claimed by him to have been present, was a material element in making the conditions such as to render it impossible for him to have seen deceased. Aside from this the motorman in his deposition, testified differently than at the trial on the question of his ability to see clearly down the track. The testimony of the motorman that he could see down the track for a distance of 500 or 600 feet gives rise to an inference that he could have seen deceased 91 feet away lying across the rail, if the testimony of plaintiff's other witnesses is to be believed to the effect that the weeds were not high enough to materially obstruct his view. This is especially true when we remember that the motorman said that he could have seen a person sitting on the track 400 or 500 feet in front of him. This inference is in conflict with his testimony that he could not have seen deceased in time to have stopped the car.. These circumstances were before the jury and it was authorized to give them consideration. [Gould v. C. B. & Q. R. R. Co., 315 Mo. 713.]

Under all of the circumstances we would not be justified in denying the right to the jury to draw the inference that the motorman, by the exercise of ordinary care, could have seen an object lying on the 'track and that such object was the body of a human being. In this case there was the duty on the motorman to look out for pedestrians at the point in question. It would not be in accordance with the dictates of humanity for a motorman, upon seeing an object upon the track disclosing the outlines of a human being, to proceed as though it might be a bundle of clothes, a pile of rubbish or the such. If he could see down the track for a distance of 500 or 600 feet, and there were no weeds to materially obstruct his view, he must have seen the outlines of the body of deceased as he lay across the track. While the motorman denied that he saw anything whatever on the track in time to have stopped the car, the jury was not required to believe him in that regard. [Gould v. C. B. & Q. R. R. Co., supra.]

We think that the court committed no error in his ruling on the demurrer to the evidence. The motion for a rehearing is overruled. All concur.